# In the United States Court of Federal Claims

No. 05-0525T

(Filed: November 15, 2006)

* * * * * * * * * * * * * * * * * * * * * * * * *

| | |
|---|---|
| USA CHOICE INTERNET SERVICE, LLC,<br>Plaintiff,<br>v.<br>UNITED STATES,<br>Defendant. | Post-trial decision on tax refund claim; applicability of communications excise tax to an internet service provider; 26 U.S.C. § 4251; local telephone service; private communication service; 26 U.S.C. § 4252; "substantial variance" rule; 26 U.S.C. § 7422(a) |

* * * * * * * * * * * * * * * * * * * * * * * * *

Anthony Gulotta, Anderson & Gulotta, P.C., Harrisburg, Pennsylvania, for the plaintiff. With him at trial was David Anderson, Anderson & Gulotta, P.C., Harrisburg, Pennsylvania.

Karen Elisabeth Servidea, Attorney, Tax Division, United States Department of Justice, Washington, D.C., for defendant. With her on the briefs were Eileen J. O'Connor, Assistant Attorney General, and David Gustafson and G. Robson Stewart, Attorneys, Tax Division, U.S. Department of Justice, Washington, D.C.

## OPINION AND ORDER

LETTOW, Judge.

USA Choice Internet Service, LLC, ("USA Choice") seeks a refund of communications excise tax it paid on certain communications services it purchased for use in providing internet access to its customers. The taxes were paid from January 1999 through April 2002 respecting various services provided by Verizon (including its predecessor entities GTE and Bell Atlantic), ALLTEL, and Sprint. Excise taxes at the statutory rate of 3% were collected by the telephone

companies and paid over to the government. *See* 26 U.S.C. ["I.R.C."] § 4251(b)(2); 26 C.F.R. ("Treas. Reg.") § 49.4251-2(c) (1993).[1]

USA Choice avers that the communications services on which it paid excise tax fell outside the scope of I.R.C. § 4251 because they were not "local telephone service" as defined in I.R.C. § 4252(a) on which the communications services excise tax is imposed by I.R.C. § 4251, or, alternatively, because they were "private communication services" excluded from tax as provided by I.R.C. §§ 4252(a) and 4252(d). USA Choice also claims that it wrongly paid the excise tax on certain long distance charges that were not "toll telephone service" subject to the tax as defined in I.R.C. § 4252(b). The government resists each of these contentions.

USA Choice filed a request for a refund with the Internal Revenue Service ("IRS") on May 24, 2002. *See* Compl. Ex. A. On April 27, 2004, the IRS notified USA Choice that its claim would be disallowed. *See* Compl. Ex. C. The taxpayer waived the formal statutory notice requirements on May 17, 2004, *see id.*, and filed its complaint in this court on May 5, 2005. The government filed its answer on July 5, 2005.

A trial was held in July 2006. The parties filed opening post-trial briefs on August 24 and 25, 2006, and responsive briefs on September 12 and 13, 2006. Closing argument was held on September 22, 2006. The case is ready for disposition.

## FACTS[2]

### A. The Characteristics of USA Choice's Dial-Up Internet System

USA Choice is an internet service provider based in Oil City, Pennsylvania, delivering internet access to residential and business customers in Pennsylvania. Compl. Ex. A; Tr. 21:18 to 23:24 (Test. of Michael Phillips, a co-founder of USA Choice). In support of its business, the

---

[1]The government does not dispute the taxpayer's payment of the taxes or that USA Choice is the proper party to seek the refund. Tr. 11:2-9.

In this opinion, references to "Tr. __" are to the transcript of the testimony at trial. References to plaintiff's exhibits admitted into evidence at trial are to "PX __" and to defendant's exhibits are to "DX __." References to "Cl. Tr. __" are to the separately paginated transcript of the post-trial closing argument.

[2]This recitation of facts constitutes the court's principal findings of fact in accord with Rule 52(a) of the Rules of the Court of Federal Claims ("RCFC"). Other findings of fact and rulings on questions of mixed fact and law are set out in the analysis.

taxpayer maintains computer servers in facilities referred to as Points of Presence ("POPs").[3] PX 1; Tr. 23:14 to 25:7, 27:10-22 (Test. of Phillips).[4]

A USA Choice customer ("dial-up customer") gains access to the internet by initiating a call with his modem to one of USA Choice's access numbers assigned to a POP. Tr. 51:19 to 52:8 (Test. of Phillips); Pl.'s Post-Trial Br. at 8; Def.'s Post-Trial Br. at 2. This communication is routed through a local loop, circuit, or channel connecting the dial-up customer's modem and the central office of the local telephone system serving the dial-up customer. Tr. 51:19 to 53:15 (Test. of Phillips); DX 2 (Expert Report of Dr. Michael Hills ("Hills Report"), who testified on behalf of the government) at 4.[5] The telephone company's central office provides "dial tone" to the customer initiating the telephone call and contains "switches" that route the call to its proper destination. DX 2 (Hills Report) at 11; Tr. 177:10 to 178:5 (Test. of Hills); *see also Ameritech Corp. v. McCann*, 308 F.Supp.2d 911, 915 (E.D. Wis. 2004), *vacated on other grounds*, 403 F.3d 908 (7th Cir. 2005). These switches are connected with switches in other locations throughout the country via the domestic telecommunications network, called the "Public Switched Telephone Network" or "PSTN." *See* Government Insts., Inc., *Telecommunications–Glossary of Telecommunication Terms* P-27 (1997) ("*Telecommunications Glossary*"); *see also Paetec Comm'ns, Inc. v. Connecticut Dept. of Pub. Util. Control*, No. Civ. A. 3:03CV1783, 2005 WL 701280, at *1 (D. Conn. 2005). "When [a call is initiated], the switch does one of two things. If the [origination point and the destination point] are both connected to the same switch, the switch simply connects the two. If the [destination point] is on a different switch, the switch routes the call to the remote switch." *Paetec Communications*, 2005 WL 701280, at *1.[6] In this instance,

---

[3]The government's expert, Dr. Michael Hills, defined Point of Presence as "[t]he physical access location interface between a local exchange carrier and an [internet service provider's] digitized packet network[- -] the point at which the telephone company terminates a subscriber's local loop circuit and the internet routing begins. The Point of Presence for an [internet service provider] was the physical location where [its] customers would connect in order to gain access to the [i]nternet." DX 2 (Expert Report of Dr. Michael Hills) at 12.

[4]The taxpayer's POPs initially were located in Altoona, Brookville, Bradford, Butler, Clarion, Dubois, Emporium, Kittanning, Oil City, Meadville, New Bethlehem, Punxsutawney, Ridgway, State College, and Warren. PX 1. Subsequently, the POPs at Bradford, Clarion, Dubois, Punxsutawney, State College, and Warren were eliminated, with the traffic routed from the local exchanges at those locations directly to the POP located at Altoona. Tr. 24:13 to 25:1 (Test. of Phillips).

[5]Charges associated with the dial-up customer's access to the telephone company's central office were borne by the dial-up customer as part of his or her local telephone service charges. DX 2 (Hills Report) at 4; Tr. 28:7-10 (Test. of Phillips).

[6]As the court in *Paetec Communications* explained:

> Calls are routed across the PSTN by means of the North American

the dial-up customer's communication is routed from the central office of the telephone company serving USA Choice over a circuit (comprising a group of communications channels, the use of which is purchased by USA Choice) to USA Choice's POP. Tr. 31:24 to 32:19, 51:19 to 53:15 (Test. of Phillips); Pl.'s Post-Trial Br. at 8; Def.'s Post-Trial Br. at 2-3. At the POP, the circuit connects to USA Choice's network access servers via a "smart jack." Tr. 137:5-13, 141:18-25 (Test. of Phillips). The smart jack is the demarcation point for responsibility between the telephone company and USA Choice. Tr. 137:8-17 (Test. of Phillips).

The telephone companies providing the circuits used by USA Choice charged USA Choice for the circuits connecting the telephone company's central office and USA Choice's POP. Tr. 31:24 to 32:20; Pl.'s Post-Trial Br. at 8; Def.'s Post-Trial Br. at 2-3. The tax at issue was assessed on the charges for these circuits. Tr. 13:9-12, 119:16 to 120:6 (Test. of Phillips).

Once the dial-up customer's communication generated by the customer's modem reaches the POP, one of the modems comprising USA Choice's network access servers answers the communication and a connection between the two modems is established. Tr. 53:10-15, 120:17 to 121:20, 140:6-13 (Test. of Phillips). For this connection to be successful, "[t]elephonic quality is required." Tr. 178:6-11 (Test. of Hills); DX 2 (Hills Report) at 4.[7] USA Choice's

---

> Numbering Plan ("NANP"). Each terminating point on the PSTN is assigned a ten-digit number, in the format NXX-NXX-XXXX, where N is any digit from 2 to 9, and X is any digit from 0 to 9. The first three digits are the Numbering Plan Area ("NPA"), more commonly called an "area code," which typically designates a specific geographic area.[FN3] For a given geographic NPA, the second three digits in an NANP number designate the switch or central office to which the customer is connected. This second set of digits is referred to as both the "central office prefix" and "NXX." Finally, for a given NPA and central office prefix – collectively known as an NPA/NXX – the last four digits designate a particular customer's phone line.
>
> > [FN3] Not all NPAs are geographic. The most common non-geographic NPAs are the so-called Easily Recognizable Codes, such as 800, 888, and 900.
>
> Accordingly, at least for geographic NPAs, when a customer dials a ten-digit telephone number, the customer is entering three pieces of routing information. The NPA directs the call to a general geographic area, the NXX directs the call to a particular switch within that geographic area, and the final four digits direct the call to a specific customer on that switch.

2005 WL 701280, at *2.

[7]When using the term "telephonic quality," the government's expert used "what [he] believe[d] would be the industry understood definition[, that is] a communication channel over

modem transmits a request for the dial-up customer's username and password, and the dial-up customer then transmits his or her username and password via his or her modem. Tr. 121:12 to 122:7 (Test. of Phillips). If the username and password do not match USA Choice's records, USA Choice's modem would transmit a further request. Tr. 122:4-15 (Test. of Phillips). After some number of unsuccessful attempts, USA Choice's modem would disconnect the call. Tr. 122:12-15 (Test. of Phillips). If the username and password are confirmed, then the dial-up customer would be connected to the internet through USA Choice's network. Tr. 144:4-18 (Test. of Phillips); Pl.'s Post-Trial Br. at 8.[8]

Limiting access through use of a username and password prevents computer users who are not USA Choice customers from connecting to the internet through USA Choice's network. Tr. 122:4-15 (Test. of Phillips). USA Choice does not block incoming calls from telephone numbers not associated with its subscribers. Tr. 145:11 to 146:1 (Test. of Phillips). One result of this aspect of USA Choice's system is that persons who are not customers but who nonetheless dial USA Choice's access numbers, whether inadvertently or purposefully, would be connected briefly to USA Choice's modem and might hear a set of electronically generated beeps before being disconnected. Tr. 121:12 to 122:15 (Test. of Phillips). Another result, however, is that a dial-up customer could connect to USA Choice's network using his or her username and password from any telephone line connected to his or her modem, even if the connection was not from his or her ordinary telephone number. Tr. 145:11 to 146:1 (Test. of Phillips).

---

which it[ i]s possible to have a two-way conversation with the use of telephones." Tr. 174:12-17 (Test. of Hills).

[8]Mr. Phillips described the dial-up customer's modem as "communicating with" USA Choice's modem. Tr. 143:2-9. He elaborated: "[I]nitially there is a negotiation that takes place between those modems so that they can understand each other and understand how to talk to each other[. This] deal[s] with . . . IEEE protocols [and the like] to compress data[, etc.] [A]t a very basic level, those modems just need to negotiate with each other so . . . they can communicate in both directions." Tr. 143:9-17.

A home-based dial-up customer typically uses a "POTS" line, a somewhat euphemistic acronym for a "Plain Old Telephone Service" line. Tr. 140:23 to 141:3 (Test. of Phillips). *See* Harry Newton, *Newton's Telecom Dictionary* 542 (17th ed. 2001) (POTS is "[t]he basic service supplying standard single line telephones, telephone lines and access to the public switched network."). The dial-up customer's modem converts his or her computer's digital signal to an analog signal that can be carried over the local telephone system's line between the customer's home and the central office. That analog signal is converted back to a digital signal by the telephone company's central office. Tr. 141:5-15 (Test. of Phillips) ("[The dial-up customer's] modem connects to [the POTS line] in their home, and it's the same type of line that they would use to pick up and call their neighbor or family member or whatever. So the modem itself is doing what's called a digital analog conversion so that the analog line between the home and the central office, that traffic can be carried over that analog line. At the central office, though, the central office telephone system changes that to a digital signal and routes that down our line.").

In general, the connections USA Choice sought to purchase from the local telephone systems to support its internet service were incoming-only channels. Tr. 28:22 to 29:18 (Test. of Phillips). It was USA Choice's understanding that the circuits it purchased were "provisioned by the telephone companies [as] inward dial lines." Tr. 29:6-12 (Test. of Phillips). However, the telephone company may not have offered an incoming-only circuit or it may not have configured the circuits USA Choice obtained as incoming-only. Arguably, as will appear from the analysis, the type of circuit USA Choice obtained for its use may have a bearing on the applicability of the communications excise tax. Consequently, as a factual matter, much of the evidence adduced by the parties at trial concerned the nature and capabilities of the circuits USA Choice obtained and on which it paid tax.

### B. The Communications Services Purchased and Used by USA Choice

#### 1. *"PRI" services.*

Most of USA Choice's purchases were of Primary Rate Interface ("PRI") groups of channels provided by ALLTEL and Verizon. A PRI circuit functions as the Integrated Services Digital Network ("ISDN") equivalent of a T-1 circuit, *see Newton's Telecom Dictionary* at 548, providing 24 channels – 23 "B" or bearer channels and one "D" or signaling and control channel. *Telecommunications Glossary* at P-21.[9] In essence, a PRI circuit, or in international parlance, a "PRA" circuit,[10] is a high-capacity digital circuit that can carry 23 simultaneous communications. Tr. 51:19-21 (Test. of Phillips). Only one local telephone number was used per circuit: "[A]ll of [the up to 23 dial-in communications at a time] are originated by dialing one telephone number so that the [dial-up] customer, when [his or her] modem dials that number, it goes through the public switch telephone network and eventually travels over this PRI . . . circuit into our network access server." Tr. 51:21 to 52:1 (Test. of Phillips). The traffic is consolidated and put on the PRI by the central office. Tr. 52:5-24 (Test. of Phillips). As Dr. Hills, the government's expert, testified, the 23 "B" or "bearer" channels "can be dedicated to or from the public network. Trunk group types include incoming, outgoing, two-way direct outward dialing or direct inward dialing . . . . [A]ny one of these could be possible on any . . . of the twenty-three channels . . . . [I]t would be up to the customer [*e.g.*, USA Choice] when they order the service to configure it for

---

[9]"T-1" stands for "Trunk Level 1." *Newton's Telecom Dictionary* at 669. It is "[a] digital transmission link with a total signaling speed of 1.544 mbps (1,544,000 bits per second)." *Id.* "In the olden days, T-1 was delivered . . . on two pairs of unshielded twisted copper wires – one pair for transmit and one pair for receive . . . . These days, T-1 often is delivered on fiber optic transmission systems." *Id.*

[10]"PRA" is an ISDN term "used internationally to mean 23B+D and also 30B+D. [It is] [t]he international version of what the Americans call PRI." *Newton's Telecom Dictionary* at 545. In this opinion, the terms PRI and PRA will be used interchangeably to mean the same type of service, with the particular nomenclature used varying by the provider's terminology.

whatever combination . . . required." Tr. 204:10-22 (Test. of Hills) (referring to PX 18, ALLTEL Pennsylvania, Inc., Telephone PA P.U.C. No. 1, Section 10.3, Advanced Digital Services–Primary Rate Access (eff. Mar. 14, 1998) ("ALLTEL PRA tariff") ¶ 10.3.3(B)).[11]

a. *ALLTEL's PRA service.*

The configuration for a given PRI service would have been established by the provider at the time of installation. As the ALLTEL tariff stated: "Basic PRA Service is provided assuming a Dedicated Trunk Configuration. Optional PRA capabilities may be used to alter that configuration. Additional charges . . . shown below." ALLTEL PRA tariff ¶ 10.3.6(A)(1). According to Dr. Hills, the government's expert, "a Dedicated Trunk configuration" means "that the function[, be it incoming, outgoing, or both ways,] of each . . . trunk[] is decided at installation time," and the telephone company would charge an additional fee to change that configuration later. Tr. 243:10-21 (Test. of Hills). Dr. Hills opined that the channels USA Choice obtained were most likely configured as incoming or possibly as two-way. Tr. 242:24-25, 245:1 to 246:7 (Test. of Hills). Either configuration by the provider would establish the requisite functionality for USA Choice's purposes. Tr. 245:1 to 246:7 (Test. of Hills).

Separate charges were made for basic service: "The basic service would essentially just be the telephone number itself. . . . [The non-basic service would be t]he PRI circuit that's carrying those calls." Tr. 54:25 to 55:14 (Test. of Phillips) (referring to PX 6, an ALLTEL invoice for telephone number 322-512-1697); Tr. 57:23 to 58:3 (referring to PX 7, an ALLTEL invoice for telephone number 322-512-1698); Tr. 79:11-18 (referring to PX 15, an ALLTEL invoice for telephone number 814-772-9075). The federal communications excise tax was paid on both basic and non-basic charges. *See, e.g.*, PX 6 (an ALLTEL invoice for telephone number 322-512-1697), PX 7 (an ALLTEL invoice for telephone number 322-512-1698), PX 15 (an ALLTEL invoice for telephone number 814-772-9075).

b. *Verizon's IntelliLinQ PRI service.*

Verizon provided USA Choice with a type of PRI service designated as "Enhanced IntelliLinQ PRI Hub Service." PX 19 (Bell Atlantic-Pennsylvania, Inc. Pa. P.U.C. No. 500, Section 22 (eff. Feb. 1, 2000) ("Verizon IntelliLinQ PRI tariff")). In applying for this service, the "[c]ustomer [,USA Choice had to], . . . certif[y] that any circuits provided . . . w[ould] be used . . . solely to provide Internet access." PX 21 (USA Choice's application for Verizon IntelliLinQ Service (June 28, 2002)) at 2. The Verizon tariff for the IntelliLinQ PRI service

---

[11]Telecommunications carriers are required to file and maintain tariffs with the Pennsylvania Public Utility Commission for each service provided. *See* 52 Pa. Code §§ 63.103 to 63.105. The tariffs must set forth a description of the service and the applicable rates and are subject to approval by Pennsylvania's Public Utility Commission. *Id.*; *see also* Tr. 195:14 to 197:4 (Test. of Hills).

provided either 23 B channels and one D channel or, alternatively, 24 B channels. Verizon IntelliLinQ tariff at Original Sheet 1A, ¶ B.1. The tariff specified that the "Service allow[ed]: (1) ISRAPs ["Information Services Remote Access Providers"] to receive dial-up traffic from their end users utilizing local telephone numbers or by dialing a single number; and (2) *B channels to be provisioned as two-way service or incoming-only service* using individual telephone numbers." *Id.* at 1st Revised Sheet 4, ¶ B.3 (emphasis added).

USA Choice contends that "this service was provisioned for and used for incoming dial-up calls only." Pl.'s Post-Trial Br. at 25; *see also* Tr. 67:10-20 (Test. of Phillips) (stating that PX 10, a Verizon invoice for telephone number 814-368-3952, shows no calls being made "because there is no outbound calling on that line."). Dr. Hills testified on behalf of the government that Verizon's Enhanced IntelliLinQ Hub Service could have been configured as either incoming only or two-way: "It depends [on] whether the signaling system at the [telephone company's] switch is . . . programmed to look . . . for that particular [signaling] bit or whether it's just told to ignore any originating calls. I have no idea." Tr. 235:22 to 236:1 (Test. of Hills). He also said "the functional use [by USA Choice] was incoming only." Tr. 235:15. Language from the tariff led Dr. Hills to conclude that USA Choice "probably [could] not" make outgoing calls. Tr. 236:23-25 (Test. of Hills). The portion of the tariff relied upon by Dr. Hills indicated that the Enhanced IntelliLinQ PRI Hub Service "offers single, LATA-wide[[12]] telephone number connectivity on a dial-up basis for the ISRAP's end user customers with transport to a designated hub interconnection within the LATA. From there, the call continues to the ISRAP's premises location over dedicated high-speed access facilities purchased separately by the ISRAP." Verizon IntelliLinQ PRI tariff at 1st Revised Sheet 1, ¶ A.[13] Additionally, Dr. Hills opined "[t]he services that were charged at $495 were for incoming calls only." Tr. 231:13-15.

At a minimum, this incoming-only "single number service" appeared to include telephone numbers 814-237-5400, 814-723-5087, and 814-940-0925. In examining a Verizon invoice, PX 9 at 3, Dr. Hills concluded that the charges were for "single number service," Tr. 219:10-21 (Test. of Hills) (relying on the $495 per month charge listed). That invoice showed "the individual charges for each channel on this particular PRI circuit." Tr. 64:5-6 (Test. of Phillips).

---

[12]LATA is an acronym for "local access and transport area." *Telecommunications Glossary* at L-8. It refers to the geographical area within which "a divested Bell Operating Company . . . is permitted to offer exchange telecommunications and exchange access services." *Id.*

[13]The tariff also states: "The ISRAP must purchase suitable access facilities from its premises location to the Telephone Company's designated point of interconnection to handle the call volume in the LATA." Verizon IntelliLinQ PRI tariff at 1st Revised Sheet 1, ¶ A. The tariff listed as a condition of the Enhanced IntelliLinQ PRI Hub Service that "[d]edicated local distribution channels from the point of interconnection to the ISRAP's customer location are provided at rates and charges, as specified elsewhere in this tariff, for the facilities used to provide the service." *Id.* at Original Sheet 4C, ¶ B.4.b.

PX 9 addresses fourteen channels associated with State College, ten channels associated with Warren, and one channel associated with Altoona.

Nonetheless, on the Verizon invoices, a long distance service was shown to be associated with one of the telephone numbers, 814-227-2694, included with the Verizon IntelliLinQ PRI service, thus at least suggesting a capability to make outgoing long-distance calls on a channel associated with that particular number. Tr. 60:21-23 (Test. of Phillips) (referring to PX 8); Tr. 248:22 to 249:22 (Test. of Hills). No actual outgoing calls were listed on invoices for that number, however. Tr. 60:18-20 (Test. of Phillips) (referring to PX 8). Mr. Phillips testified that "no long distance calls originated over this line . . . [b]ecause you can't place an outgoing call over this particular line." Tr. 61:19-23 (Test. of Phillips). Plaintiff's counsel attributed the long distance service for this number and "maybe two or three" other numbers to a billing error. Tr. 62:8-24.

c. *Sprint's PRI service.*

USA Choice also used a PRI service offered by Sprint, described in a tariff admitted into evidence as DX 5, Sprint Communications Company L.P., Telephone PA P.U.C. Tariff No. 5, Supplement No. 18, Section 5, 2nd Revised Page 21, and Original Page 38, and Supplement No. 43, 3d Revised Page 22 and 2d Revised Page 23 ("Sprint PRI tariff"). The Sprint PRI tariff specified that "*[t]raffic can be inward, outward or a combination of both. This is controlled by the Customer's CPE* [Customer Premises Equipment]." Sprint PRI tariff at 2d Revised Page 21, ¶ 5.3.6.A.1 (emphasis added). Based upon an examination of the tariff, Dr. Hills opined that "traffic can be outward and that local exchange access includes [usage]-sensitive local calling. . . . [I]t's explicitly available for outgoing calls." Tr. 213:24 to 214:2 (Test. of Hills).

2. *"DCS" services.*

Besides the PRI services on which USA Choice primarily relied, it also used two types of Digital Channel Services ("DCS") provided by ALLTEL and Verizon's predecessor, GTE North Incorporated.

a. *ALLTEL's DCS service.*

ALLTEL's DCS service "package[d] Private Branch Exchange ("PBX") trunks and DID ["direct inward dialing"] trunks with a T-1 transmission facility." PX 8 (ALLTEL Pennsylvania, Inc., Telephone-PA P.U.C. No. 1, Section 10.2, Fourth Revised Contents, at First Revised Sheet 18 (eff. March 14, 1998) ("ALLTEL DCS tariff"). Under the ALLTEL DCS tariff, each facility provided up to 24 channels. *Id.* at ¶ 10.2.1.B. The "Exchange Services (per channel) – define[d] how each channel is to be used." *Id.* at ¶ 10.2.2.B. A charge applied to each channel, and when features were changed after initial installation, a separate additional charge was made. *Id.* at First Revised Sheet 20, ¶ 10.2.5.

USA Choice maintains that its ALLTEL DCS service at Emporium "was provisioned for inward dial only." Pl.'s Post-Trial Br. at 26. USA Choice "concede[d]" that the other ALLTEL accounts were "not direct inward dial." Cl. Tr. 13:14-23, 16:18-21. USA Choice avers "a review of the invoices [for the service it claims was incoming only] notes that it is a 'Direct in Dial Trunk.'" Pl.'s Post-Trial Br. at 26; *see also* Cl. Tr. 13:14-16. The words "direct in dial trunk" appear on an invoice associated with this service. *See* PX 5 at 1A.[14] By contrast, Dr. Hills stated he "would have every expectation this service would allow outgoing calls." Tr. 199:17-19, 200:22-23. According to him, any "restrict[ions] . . . to outgoing calls [only] would be [imposed by] customer premise equipment." Tr. 201:11-13. He opined that "nothing in the tariff suggests that" ALLTEL provided the service in a way that prevented outgoing calls. Tr. 201:15-18 (Test. of Hills); *see also* Tr. 200:12 (Test. of Hills) ("There is no mention of directionality of origination" in the tariff.).

b. *Verizon's DCS service.*

Verizon (and its predecessor GTE) offered a DCS service used by USA Choice, described in a tariff admitted into evidence as PX 20 (GTE North Incorporated, Telephone-Pa. P.U.C. No. 3, Section 18, Original Sheets 1-14 (eff. Aug. 19, 1994) ("Verizon DCS tariff")). Verizon's CONTROLINK® DCS service was offered as a T-1 service with either 24 or 28 channels. Verizon DCS tariff at Original Sheet 1, ¶ A.1.c.(2). The rates for the service applied across the group of channels, and not to individual channels within the group. *Id.* at Original Sheet 7, ¶ 18.A.6.b(1).

The evidence at trial was in conflict respecting whether Verizon's DCS service as provided to USA Choice was configured by Verizon to allow outgoing as well as incoming calls. On the one hand, Mr. Phillips testified that the "DCS circuits don't originate calls outbound and they don't use long distance." Tr. 73:15, 75:15-16 (Test. of Phillips). On the other hand, Dr. Hills testified the DCS lines "had the capability" of originating outgoing calls. Tr. 221:15 to 222:11 (Test. of Hills). In examining a particular invoice dated April 13, 2001, related to telephone number 814-677-8724, and comparing it with the Verizon DCS tariff, Dr. Hills noted that this number had charges for a measured-service option, for which there would be a separate charge for each outgoing call. *See* Tr. 221:15 to 222:15 (Test. of Hills) (comparing DX 8 with the Verizon DCS tariff at First Revised Sheet 9).[15] However, the measured-service option in the

---

[14]*Newton's Telecom Dictionary* defines "direct inward dialing" as "[t]he ability for a caller outside a company to call an internal extension without having to pass through an operator or attendant." *Newton's Telecom Dictionary* at 212.

[15]He explained, "For seven dollars, you could have outgoing calling, measured service whereby seven dollars is obviously much cheaper than [the] thirty-five dollar [alternative], but you pay for every outgoing call you make. Consequently, the prudent person ordering this service would choose the seven dollar option because they had no intention of making outgoing calls on these lines, but they had the capability. When you look at the invoice, you will see that

tariff related to analog services, not digital data services. Verizon DCS tariff at First Revised Sheet 9, ¶ 18.6.c(b).[16]

3. *"BRA" services.*

At one location, ALLTEL provided USA Choice with a "BRA" service. PX 18 (ALLTEL Pennsylvania, Inc., Telephone PA P.U.C. No. 1, Second Revised Sheet, ¶ 10.1.1.A (eff. March 14, 1998) ("ALLTEL BRA Tariff"). The acronym "BRA" refers to "basic rate access" and is "[a] Canadian term for the ISDN 2B+D standard, which is called BRI ['basic rate interface'] in the US." *Newton's Telecom Dictionary* at 100-101. As the definition suggests, ALLTEL's BRA service provided USA Choice with "just a two channel circuit plus a signaling channel." Tr. 81:15-18 (Test. of Phillips). The ALLTEL BRA tariff provided that the service could be configured to allow, among other things, "the user to originate and receive only data calls over a single circuit-switched B channel." ALLTEL BRA tariff at Second Revised Sheet 1, ¶ 10.1.1.C.1.b. The tariff ostensibly did not provide for an incoming-only option. Dr. Hills accordingly opined that the ALLTEL BRA service "can provide . . . two-way communication for originating calls and for terminating calls." Tr. 210:20 to 211:10 (Test. of Hills). Mr. Phillips testified that USA Choice used the BRA service in a way that precluded incoming calls. Tr. 125:15-17, 127:15-16 (referring to DX 1, an ALLTEL invoice for telephone number 814-849-0167).

4. *Other services.*

a. *ALLTEL "private lines."*

Dr. Hill described telephone numbers 825-512-0339 and 825-513-0397 as "private lines."

---

there were 288 seven dollar charges applied, so they chose the measured service option." Tr. 221:23 to 222:7 (Test. of Hills).

[16]An "interstate access charge," "interstate subscriber line charge," and a "DCS Interstate access charge" are each separately stated from the DCS activation and channel fees on an invoice dated April 13, 2001. *See* DX. 8. There were also charges for "CentraNet feature package 2000." *See id.*; Tr. 221:1-7 (Test. of Hills).

PX 12 is a Verizon North invoice for a time period subsequent to the period covered by the current claim, relating to 814-676-3909. This invoice shows Sprint long distance charges. Mr. Phillips explained that these charges appeared on this invoice "because we have staff offices and tech support staff at the Oil City office, so we would be using Sprint as a long distance carrier." Tr. 72:16-18 (Test. of Phillips). He agreed with plaintiff's counsel's statement that – "[S]o, in addition to having the DCS capability, which is bringing the data traffic to your router, to your location, to your modems actually from the central office, you also have regular phone lines and Verizon has just put those regular phone lines on here?" Tr. 72:19-25 (Test. of Phillips). However, the only monthly service shown on the Verizon invoice is DCS. No "regular phone lines" appear. PX 12.

DX 3 at 2; *see also* PX 3 at 1. He used the "private line" label to indicate "a service that doesn't access the local exchange switching services." Tr. 262:2-5 (Test. of Hills).[17]

b. *Bell Atlantic long distance.*

USA Choice also included a claim for refund of the communications excise tax paid on "long distance" service that arguably did not constitute taxable "toll telephone service" because the charges for the service were not based upon time and distance. PX 3 at 1-2. A review of the pages from the invoices that were admitted into evidence shows Bell Atlantic and later Verizon "tolls" for telephone number 814-375-8001. *See* PX 5 at 157 to 164B. A review of the corresponding pages for a second claimed set of charges, for telephone number 814-938-9600, does not include similar line items. *See* PX 5 at 318 to 331B.

**BURDENS OF PROOF AND PERSUASION**

The plaintiff bears the burden of establishing that the court has subject matter jurisdiction over its claim. *McNutt v. General Motors Acceptance Corp. of Ind.*, 298 U.S. 178, 189 (1936); *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988). Before this court can exercise jurisdiction over a tax refund claim, the plaintiff must have first filed a tax refund claim with the IRS. I.R.C. § 7422(a).[18] The claim filed with the IRS must "set forth in detail each ground upon which a . . . refund is claimed and facts sufficient to apprise the Commissioner

---

[17]The government's expert explained that this means that "at the central office, there will be 24 jacks, and they can plug some of those jacks into the switch and some of those jacks can go off to private line services and some can go off to other data services." Tr. 253:16-20 (Test. of Hills).

An examination of the tariffs led the government's expert to conclude that other telephone numbers were not "private lines" because in his view "they all incorporated access to the local exchange carrier's switches as an integral part of the service." Tr. 262:10-21 (Test. of Hills).

[18]The statute reads as follows:

> No suit or proceeding shall be maintained in any court for the recovery of any internal revenue tax alleged to have been erroneously or illegally assessed or collected, or of any penalty claimed to have been collected without authority, or of any sum alleged to have been excessive or in any manner wrongfully collected, until a claim for refund or credit has been duly filed with the Secretary [of the Treasury], according to the provisions of law in that regard, and the regulations of the Secretary established in pursuance thereof.

I.R.C. § 7422(a).

[of Internal Revenue] of the exact basis thereof." Treas. Reg. § 301.6402-2(b)(1).[19] "Courts have long interpreted § 7422(a) and Treasury Reg. § 301.6402-2(b)(1) as stating a 'substantial variance' rule which bars a taxpayer from presenting claims in a tax refund suit that 'substantially vary' the legal theories and factual bases set forth in the tax refund claim presented to the IRS." *Lockheed Martin Corp. v. United States*, 210 F.3d 1366, 1371 (Fed. Cir. 2000) (citing *Cook v. United States*, 599 F.2d 400, 406 (Ct. Cl. 1979)). "The substantial variance rule (1) gives the IRS notice as to the nature of the claim and the specific facts upon which it is predicated; (2) gives the IRS an opportunity to correct errors; and (3) limits any subsequent litigation to those grounds that the IRS had an opportunity to consider and is willing to defend." *Lockheed Martin*, 210 F.3d at 1371 (citing *Ottawa Silica Co. v. United States*, 699 F.2d at 1124, 1138-40 (Fed. Cir. 1983)); *Union Pac. R.R. v. United States*, 389 F.2d 437, 442 (Ct. Cl. 1968)).

Thus, to be addressed by a court, the legal ground for a refund claim must be presented by the taxpayer to the IRS. A "legal theory not expressly or impliedly contained in the application for refund cannot be considered by a court in which a suit for refund is subsequently initiated." *Lockheed Martin*, 210 F.3d at 1371 (quoting *Burlington N., Inc. v. United States*, 684 F.2d 866, 868 (Ct. Cl. 1982)). However, as long as the "claim fairly apprises the Commissioner of the ground on which recovery is sought, . . . the claim is adequate for the purposes of bringing suit under [Sub]section 7422(a)." *Burlington N.*, 684 F.2d at 869.

Furthermore, the factual foundation for a refund claim must also have been put at issue before the IRS. "The taxpayer similarly may not substantially vary at trial the factual bases raised in the refund claims presented to the IRS." *Lockheed Martin*, 210 F.3d at 1371 (citing *Ottawa Silica*, 699 F.2d at 1138). In *Ottawa Silica*, a depletion deduction based on multiplying the gross income from a mining activity by an applicable rate was at issue. 699 F.2d at 1136. There, the taxpayer's refund claim to the IRS challenged the IRS's determination of the applicable rate, but the taxpayer did not argue that the gross income multiplicand, on which the disputed deduction was based, was erroneously low. *Id.* at 1136-38. The court rejected the taxpayer's contention that jurisdiction to consider the appropriate applicable rate in calculating the depletion deduction extended to determining the appropriate gross income multiplicand, finding the two to be separate matters, each with "a different factual basis and neither [being] a subsidiary of or integral to the other." *Id.* at 1138-39. Because the taxpayer's refund claim to the IRS did not sufficiently apprise the IRS of the second issue, the court could not consider it. *Id.* Thus, for this court to consider a claim for a refund of taxes, the taxpayer must first establish that it sufficiently apprised the IRS of the same grounds and facts on which the taxpayer bases its claim before this court.

---

[19]This regulation specifies that "[n]o refund . . . will be allowed . . . except upon one or more of the grounds set forth in a claim [made to the Internal Revenue Service]. . . . A claim which does not comply with this paragraph will not be considered for any purpose as a claim for refund or credit." Treas. Reg. § 301.6402-2(b)(1).

Once jurisdiction is established, "[a] tax refund suit is a *de novo* proceeding, in which the plaintiff bears the burden of proof, including both the burden of going forward and the burden of persuasion." *Sara Lee Corp. v. United States*, 29 Fed. Cl. 330, 334 (1993) (citing *Helvering v. Taylor*, 293 U.S. 507, 515 (1935) (burden of proof); *Lewis v. Reynolds*, 284 U.S. 281, 283, *modified*, 284 U.S. 599 (1932) (burden of proof); *Rockwell v. Commissioner*, 512 F.2d 882, 885 (9th Cir. 1975) (Duniway, J.) (burden of proof); *George E. Warren Corp. v. United States*, 141 F.Supp. 935, 940 (Ct. Cl. 1956) (*de novo*); *Snap-On Tools, Inc. v. United States*, 26 Cl. Ct. 1045, 1055 (1992) (burden of proof)). "A plaintiff who is claiming a tax refund must prove [its] case by a preponderance of the evidence." *Ebert v. United States*, 66 Fed. Cl. 287, 291 (2005) (citing *Cook v. United States*, 46 Fed. Cl. 110, 116 (2000)). "[T]he assessment made by the [Internal Revenue] Service is presumed to be correct and this places an obligation on the taxpayer . . . to rebut a presumption of correctness." *Cook v. United States*, 52 Fed. Cl. 62, 67 n.6 (2002) (citing *United States v. Janis*, 428 U.S. 433, 440-41 (1976); *Welch v. Helvering*, 290 U.S. 111, 115 (1933)). Procedurally, this "requires the taxpayer to come forward with enough evidence to support a finding contrary to the Commissioner's determination." *Rockwell*, 512 F.2d at 885. "Plaintiff then must prove the exact dollar amount of the alleged overpayment to which it claims a refund." *Sara Lee*, 29 Fed. Cl. at 334 (citing *Janis*, 428 U.S. at 440; *Missouri Pac. R.R. v. United States*, 338 F.2d 668, 671 (Ct. Cl. 1964)).

"When interpreting federal tax provisions as a matter of law or as a mixed question of law and fact, the statutory language should be given its natural and quotidian meaning and should not be extended by implication to reach other matters." *America Online, Inc., v. United States*, 64 Fed. Cl. 571, 576 (2005) (citing *Gould v. Gould*, 245 U.S. 151, 153 (1917)), *appeal dismissed by agreement*, 185 F. App'x 946 (Fed. Cir. 2006). In this respect, a distinction should be made between statutory provisions that levy a tax and provisions that exempt taxpayers or services from a tax. *See White v. United States*, 305 U.S. 281, 292 (1938); *see also United Dominion Indus. v. United States*, 532 U.S. 822, 838, 839 & n.1 (2001) (comparative commentary by Justice Thomas, concurring, and Justice Stevens, dissenting). Though the ultimate burden of proof rests upon the plaintiff, the government must identify the statutory authority for imposition of a tax. *See America Online*, 64 Fed. Cl. at 576 (quoting *Leavell v. Blades*, 237 Mo. 695, 700-01 (1911) ("When the tax gatherer puts his finger on the citizen, he must also put his finger on the law permitting it.")); *see also Ocean Drilling & Exploration Co. v. United States*, 988 F.2d 1135, 1156 (Fed. Cir. 1993); *Estate of Renick v. United States*, 687 F.2d 371, 376 (Ct. Cl. 1982) (quoting *Gould*). Correlatively, when a taxpayer seeks to avail himself of a statutory exemption or deduction, he "must be able to point to an applicable statute and show that he comes within its terms." *America Online*, 64 Fed. Cl. at 576 (quoting *White*, 305 U.S. at 292, which in turn quotes *New Colonial Ice Co. v. Helvering*, 292 U.S. 435, 440 (1934)).

**ANALYSIS**

USA Choice's request for a refund concerns the communication excise tax paid from January 1999 through April 2002 on its purchase of dial up access and Internet Service Provider ("ISP") network lines that were used to provide internet access for its customers. Compl. Ex. A.

That refund request and the IRS's denial satisfied the jurisdictional prerequisites for raising the tax refund claim in this court insofar as that claim relates to tax paid on internet-access channels and circuits.

### A. The Excise Tax on Local Telephone Service

Congress has imposed a three percent excise tax on "communications services." I.R.C. § 4251(a)(1). For purposes of this tax, Congress has defined "communications services" to include "local telephone service," I.R.C. § 4251(b)(1)(A), which in turn is defined as:

> (1) the access to a local telephone system, and the privilege of telephonic quality communication with substantially all persons having telephone or radio telephone stations constituting a part of such local telephone system, and
> (2) any facility or service provided in connection with a service described in paragraph (1).

I.R.C. § 4252(a). The statutory definition includes an exclusion, *viz.*, "[t]he term 'local telephone service' does not include any service which is a 'toll telephone service' or a 'private communication service' as defined in subsections (b) and (d)." *Id.*[20]

The parties offer competing interpretations of these statutory terms. USA Choice contends that the statutory definition covers standard local telephone service but does not embrace certain specialized services such as those services provided on an "incoming only" basis that do not allow outgoing calls to be placed. Pl.'s Post-Tr. Br. at 22-23. According to USA Choice, the services in question were configured to prevent outgoing telephone calls. *Id.* at 23-26. The government, on the other hand, argues that the elements of the "local telephone service" definition can be satisfied even if the service at issue is restricted to incoming-only. Def.'s Post-Tr. Br. at 4. Although the government disputes the taxpayer's claimed inability to originate calls using some of the services at issue, the government insists that a factual inquiry into whether the services purchased by USA Choice permitted outgoing calls is irrelevant. *Id.* at 12.

"In cases of statutory interpretation, courts first examine the plain meaning of the statute, and if it is unambiguous, enforce that meaning." *America Online*, 64 Fed. Cl. at 577 (citing *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992)). The examination for plain meaning must take account of the statutory context. "It is a fundamental canon of statutory

---

[20]The communications services so taxed under Section 4251(b)(1) also include "toll telephone service" and "teletypewriter exchange service," each of which is also specifically defined by Section 4252 in technological terms that reflect customary usage in 1965, the date the statutory provisions were revised by the Excise Tax Reduction Act of 1965, Pub. L. No. 89-44, § 302, 79 Stat. 136, 146, to put the current definitions in place. *See America Online*, 64 Fed. Cl. at 578.

construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Davis v. Michigan Dept. of Treasury*, 489 U.S. 803, 809 (1989); *see also Terry v. Principi*, 340 F.3d 1378, 1385 (Fed. Cir. 2003) ("When we construe a statute, we do so in the setting of the statutory scheme of which it is a part."); *Splane v. West*, 216 F.3d 1058, 1068-69 (Fed. Cir. 2000). If possible, a court must endeavor to interpret the statute "as a symmetrical and coherent . . . scheme," *Gustafson v. Alloyd Co.*, 513 U.S. 561, 569 (1995), melding "all parts into a harmonious whole." *Federal Trade Comm'n v. Mandel Bros.*, 359 U.S. 385, 389 (1959). *See also Imazio Nursery, Inc. v. Dania Greenhouses*, 69 F.3d 1560, 1564 (Fed. Cir. 1995) ("[P]arts of an act relating to the same subject should be considered together, and not each by itself.") (quoting 2 Sutherland & Lewis, *Statutory Construction* § 344 (1904)).

1. *Access to a local telephone system.*

The parties' statutory arguments first focus on the meaning of the word "access." The government contends the services at issue provided "access" to the local telephone system because they "enabled plaintiff to 'communicate with' other telephone stations constituting part of the local telephone system." Def.'s Post-Tr. Resp. at 9. By contrast, USA Choice argues that for a service to provide "access to a local telephone system," I.R.C. § 4252(a)(1), the service must provide the "ability to enter the local telephone system . . . when [the taxpayer] choose[s]." Pl.'s Post-Tr. Br. at 22. Thus, USA Choice contends that a service that does not allow initiation of outgoing calls does not provide the "access" requisite to "local telephone service," *id.* at 23, and that many of the services in question permitted only incoming calls. Pl.'s Reply Brief to Def.'s Post-Trial Brief ("Pl.'s Post-Tr. Reply") at 8. The government counters by arguing that definitions of access suggesting physical entry (*e.g.*, "ability to enter") are inapposite because a local telephone system is not a physical place. Def.'s Post-Tr. Resp. at 8. Instead, the government urges definitions of "access" such as "ability to enter, approach, communicate with, or pass to and from" or "ability to obtain or make use of." Def.'s Post-Tr. Br. at 4-5 (citing *Webster's Third New Int'l Dictionary* (1986)).

The Federal Circuit has addressed the term "access" as it is used in the parallel definition of "teletypewriter exchange service," which is also subject to the same excise tax. *See Trans-Lux Corp. v. United States*, 696 F.2d 963, 965-68 (Fed. Cir. 1982).[21] There, the trial judge had concluded that "the word access was recognized . . . as meaning the interface or connection between the Telex network's transmission lines (and the central exchange) and the [customer-provided terminal]." *Id.* In deciding that charges paid by the taxpayers for leasing teletypewriter equipment were not paid for "teletypewriter exchange service," the Federal Circuit held that "[a]ccess to the Telex network was . . . provided by Western Union's [Telex Line Adapter] . . . ,

---

[21]For purposes of the communications excise tax, "the term 'teletypewriter exchange service' means the access from a teletypewriter . . . to the teletypewriter exchange system of which such station is a part, and the privilege of intercommunication by such station with substantially all persons having teletypewriter . . . stations constituting a part of the same teletypewriter exchange system." I.R.C. § 4252(c).

and not by [the] teletypewriters." *Id.* As the Federal Circuit observed, "a subscriber to the Telex network could direct-dial any other network subscriber through Western Union's central exchange and establish a point-to-point connection." *Id.* at 964. In determining whether the service at issue provided "access," however, the Federal Circuit had no reason to consider directionality of messages but instead focused simply on whether the Telex Line Adapter or the teletypewriter was the device that actually provided the interconnection with the network. *Id.* at 965-68.

Here, the issue is more complex, because the word "access" might be interpreted to mean that USA Choice could receive communications from any other station within the local telephone system, even though an incoming-only service would not allow USA Choice itself to "approach" or "enter" the local system or "pass to and from" the system as it might choose. In short, the dictionary definition of "access" could be read both ways.

2. *"[P]rivilege of telephonic quality communication with substantially all persons having telephone . . . stations constituting a part of such local telephone system."*

In addition to providing access to the local telephone system, the definition of "local telephone service" requires "the privilege of telephonic quality communication with substantially all persons having telephone . . . stations constituting a part of such local telephone system." I.R.C. § 4252(a)(1).

The meanings advocated by the parties for the word "privilege" are nuanced. The government points to *Comdata Network, Inc. v. United States*, 21 Cl. Ct. 128 (1990), where the court observed: "In everyday speech the word 'privilege' connotes right . . . . Accordingly, the tax is applicable because the service provided plaintiff grants it the right to utilize the telephone lines to communicate with a substantial number of stations in a distant area." *Id.* at 130-31; *see* Def.'s Post-Tr. Br. at 8-9. USA Choice emphasizes that "a privilege grants someone the legal freedom to do or not to do a given act." Pl.'s Post-Tr. Br. at 22 (quoting *Black's Law Dictionary* 1004 (abridged 8th ed. 2005)). USA Choice avers that privilege is lacking where the services are configured as incoming-only, because USA Choice's ability to communicate is entirely dependant on someone else's action to initiate a call. Pl.'s Post-Tr. Reply at 10. The government responds that "'privilege' [does] connote some type of freedom on the part of the actor, [but] nothing in the definition[] . . . indicates that the freedom must be boundless." Def.'s Post-Tr. Resp. at 9.

The word "privilege" must be read in the context of "telephonic quality communication with substantially all persons having telephone . . . stations constituting a part of [the] local telephone system." I.R.C. § 4252(a)(1). In particular, the local telephone service definition requires the "privilege of . . . communication *with* substantially all persons having telephone . . . stations," *id.* (emphasis added), in contrast to the definition of toll telephone service set out in the next subsection of Section 4252, which uses the language "privilege of . . . communications *to or from* all or a substantial portion of the persons having telephone . . . stations." I.R.C.

§ 4252(b)(2) (emphasis added). The words "to or from" capture single-direction communications within their meaning, but the word "with" connotes reciprocity. As the definition of "with" in *Webster's Seventh New Collegiate Dictionary* 1026 (1970) indicates, "with" is "used as a function word to indicate one to whom a usu[ally] reciprocal communication is made."

In support of its position that "with" in the context of I.R.C. § 4252 should be interpreted as equal to "to or from," the government offers Revenue Ruling 77-196, 1977 WL 43147. That revenue ruling addressed automatic call distributing systems capable only of receiving incoming calls with auxiliary or separate trunk lines that could be equipped to enable origination of outgoing calls to a local telephone exchange. Separate charges were made for the auxiliary circuits that could be used for outgoing calls. *Id.* The IRS ruled that both the basic and auxiliary services were subject to the communications excise tax as "local telephone service," commenting that: "in defining taxable local telephone service, [S]ection 4252(a)(1) makes no distinction between systems that provide access to a local telephone network only by receiving calls and systems that both receive and originate calls . . . . [T]he fact that in the instant case the . . . equipment can only receive incoming calls from a local telephone system is not material to the tax determination." *Id.* In Revenue Ruling 77-196, the IRS did not address reciprocity of communications but rather focused upon the distinctions between taxable local telephone service and private communications service exempt from tax under Subsections 4252(a) and (d). *Id.*

Revenue rulings lack the force of law, *see Western Co. of N. Amer. v. United States*, 323 F.3d 1024, 1032 (Fed. Cir. 2003) ("[R]evenue rulings merely represent the position of the United States and do not bind this court."), although they may be instructive in the absence of controlling authority. *See, e.g., Sealy Power, Ltd. v. Commissioner of Internal Revenue*, 46 F.3d 382, 394-95 (5th Cir. 1995) (applying certain factors employed in previous revenue rulings); *St. Louis Bank for Coop. v. United States*, 624 F.2d 1041, 1050 (Ct. Cl. 1980) ("Revenue rulings . . . can provide some guidance as to the types of transactions [in this case]."). Arguably, revenue rulings are entitled to deference to the extent that they reflect well-reasoned, long-standing interpretations of the Internal Revenue Code or tax regulations.[22] As this court previously explained,

> [w]hen agency interpretations lack the force of law, such interpretations are entitled to deference "only to the extent that those interpretations have the 'power to persuade.'" *Christensen v. Harris County*, 529 U.S. 576, 587 (2000) (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)). This limited reliance, denominated "*Skidmore* deference," is contrasted with *Chevron* deference, which defers to reasonable, authorized agency interpretations of statutes when the meaning of those statutes is ambiguous. *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-44 (1984). *Skidmore* deference is appropriate

---

[22]The Supreme Court has deferred ruling on whether revenue rulings are entitled to deference. *See United States v. Cleveland Indians Baseball Co.*, 532 U.S. 200, 220 (2001).

> when considering "[i]nterpretations such as those in opinion letters – like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law." *Christensen*, 529 U.S. at 587. . . . Prior to the Supreme Court's decisions in *Chevron* and *Christensen*, this court's predecessor granted *Skidmore* deference to IRS revenue rulings. *St. Louis Bank for Coops. v. United States*, 624 F.2d 1041, 1050-51 (Ct. Cl. 1980).

*America Online*, 64 Fed. Cl. at 580 (second alteration in original). The weight given agency interpretations entitled to *Skidmore* deference "depends on 'the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.'" *See id.* (quoting *United States v. Mead Corp.*, 533 U.S. 218, 228 (2001) (in turn quoting *Skidmore*, 323 U.S. at 140)).

Revenue Ruling 77-196 is not particularly persuasive respecting the question of statutory interpretation at issue in this case. The previously quoted language of this revenue ruling focused on the "access" portion of the definition of "local telephone service" in addressing the distinction between taxable local telephone service and exempt private communications service. *Id.* It did not consider the "privilege of telephonic quality communication with substantially all" local telephone system subscribers under I.R.C. § 4252(a)(1). Both "access" and "privilege . . . with substantially all persons" must be satisfied in order for a service to be taxable. Regarding the issue at the heart of this case, Revenue Ruling 77-196 simply stated, without an accompanying rationale, that the incoming-only lines at issue there provided the "privilege of telephonic communication with substantially all other persons in that local telephone network," and consequently it did not address whether, for the incoming-only services, reciprocity is necessarily indicated by Congress's use of the word "with."

The government contends that a measure of reciprocity is available with incoming circuits. It argues that even if all of USA Choice's circuits were configured to be incoming only, "USA Choice would be able to communicate with anyone who called in." Cl. Tr. 44:21 to 45:8-9. This argument by the government, however, reaches too far. It ignores the statutory language requiring that the privilege of "communication with" extend to "*substantially all persons* having telephone . . . stations constituting a part of such local telephone system." I.R.C. § 4252(a)(1) (emphasis added). Where USA Choice purchased digital circuits such as PRI groups of channels, functioning as the Integrated Services Digital Network equivalent of a T-1 circuit, those channels were not necessarily configured for voice communications. Granted, USA Choice in several instances did cause the circuit provider so to configure one or more PRI channels. *See, e.g.*, PX 8 (Verizon invoice indicating long distance service associated with telephone number 814-227-2694). Otherwise, USA Choice was only able to communicate with those local telephone system subscribers who (1) initiated a call to USA Choice, (2) had a modem, and (3) had a valid USA Choice username and password.

A telephone service subscriber using a mere telephone station would not have been able to transmit or receive the type of signal carried over the channels the services at issue typically are configured to provide.[23] The subscriber would need to use a computer modem. The IRS itself has previously recognized that this limitation can cause the privilege of telephonic quality communication to be with less than substantially all persons with a telephone station. In Revenue Ruling 79-245, 1979 WL 51191, the IRS considered whether fees for leasing computer equipment including modems constituted charges for local telephone service subject to the communications excise tax. The IRS concluded that "the type of telephone signal produced by the modems is usable only for nonvoice data transmission to other computer stations . . . . Therefore, a modem is not a facility provided in connection with the privilege of telephonic quality communication with substantially all persons having stations in the local system." *Id.* Here also, the government recognizes that the logical interpretation of Section 4252(a)(1) is that to be included within the definition, a service must allow voice communication. *See* Def.'s Post-Tr. Resp. at 12 ("[O]ne could argue that the service must be able to support voice communication").[24]

---

[23] A "telephone station" is defined as "[a]n installed telephone set and associated wiring and apparatus, in service for telephone communication." Institute of Electrical and Electronics Engineers, Inc., *The New IEEE Standard Dictionary of Electrical and Electronics Terms* 1346 (5th ed., 1993). A "telephone set" is defined as "[a]n assemblage of apparatus including a telephone transmitter, a telephone receiver, and usually a switch, and the immediately associated wiring and signaling arrangements." *Id.* at 1345. A telephone receiver is "[a]n earphone for use in a telephone system." *Id.* at 1084. A telephone transmitter is "[a] microphone for use in a telephone system." *Id.* at 1346.

"Telephone station" is not a term in common or general usage. It is a technical term found only in engineering parlance. Accordingly, "the meaning attached to it by those who are familiar with such parlance [is] relevant in determining the meaning of the term as used by Congress." *Order of Ry. Conductors of Am. v. Swan*, 329 U.S. 520, 525 (1947). *See also O'Hara v. Luckenbach S.S. Co.*, 269 U.S. 364, 370 (1926) (A legislative "phrase . . . is to be given the meaning which it had acquired in the language and usages of the trade to which the act relates."). The term "telephone stations," as it is used in I.R.C. § 4252(a)(1), encompasses telephone sets, each having an earphone and microphone, but cannot be considered to include modems.

[24] The government posits that "to use the services [at issue] with a telephone, plaintiff would have to use additional customer[-]premise equipment, such as a multiplexor or PBX." Def.'s Post-Tr. Resp. at 13-14. The channel or circuit would also have to be configured by the provider to allow use of that customer-premise equipment.

In Revenue Ruling 79-245, the IRS opined that the computer user, "by plugging in a regular telephone set, if it so chooses, . . . may exercise the privilege of telephonic (voice) quality communication with substantially all persons having telephones in the local system within the meaning of [S]ection 4252(a) of the Code." In this respect, USA Choice's customers presumably paid the communications excise tax on all of *their* lines to the local telephone provider's central

Even if substantially all local telephone system subscribers possessed a modem and chose to use it to call USA Choice, there would be no "communication" in the normal sense of the word. Communication cannot occur until the caller supplies a recognized username and password to USA Choice.[25] The transmission of the identification request is so limited that it cannot be considered to be a "telephonic quality communication" in the ordinary sense of those words.[26]

Accordingly, those digital circuits, the use of which was obtained by USA Choice from providers in a form that was configured as incoming-only for digital use, do not fall within the definition of "local telephone service" within the meaning of I.R.C. § 4252(a). Thus, they were not subject to the communications services excise tax imposed by I.R.C. § 4251. A refund of amounts paid by USA Choice respecting these circuits is proper.

---

exchange, even if a particular line might be used exclusively for a computer connection. As the IRS put it in Revenue Ruling 79-245, "[w]here a telephone service provides the subscriber with the privilege of telephonic quality communication with substantially all other subscribers to the local telephone system, it is immaterial whether the subscriber exercises that privilege." The issue here, however, is whether USA Choice, not its customers, had the "privilege" to which I.R.C. § 4252(a)(1) refers.

[25]The government cites Revenue Ruling 79-245 to suggest a taxpayer's decision to use security codes to restrict access to a service goes to the taxpayer's decision about how it will exercise its privilege, not the existence of its "privilege of telephonic quality communication with substantially all persons having telephone . . . stations constituting a part of [the] local telephone system" within the meaning of Section 4252(a)(1). Def.'s Post-Tr. Br. at 10-11. However, in Revenue Ruling 79-245, the IRS's reasoning did not address the taxpayer's use of access codes but instead focused on the telephonic capability of the telephone lines in reaching the conclusion that the telephone lines in question were taxable. *See supra*, at 20 n.24.

[26]The government suggests that anyone in the local calling area could maintain a two-way telephonic-quality connection with the modem for the brief time period that would pass before USA Choice's modem disconnected the caller. *See* Tr. 120:2 to 121:8, 122:25 to 123:8, 182:2-6, 183:20 to 184:25. In that respect, "USA Choice concedes that the lines in question provide a telephonic quality *connection*." Pl.'s Post-Tr. Br. at 21 (emphasis added). However, the language of the statute is "telephonic quality communication." I.R.C. § 4252(a)(1). Definitions of the word "communication" include "an act or instance of transmitting," "an exchange of information," "a process by which meanings are exchanged between individuals through a common system of symbols," and "the technology of the transmission of information." *Webster's Seventh New Collegiate Dictionary* 168 (1970). While a "telephonic quality connection" might be present, the transmission is not in the form that allows "telephonic quality communication."

Some of the circuits respecting which USA Choice seeks a tax refund, however, were not configured by the providing telephone company as incoming-only. Even if USA Choice only used the two-way circuits for incoming calls and never for outgoing calls, the circuits still fell within the "local telephone service" definition. USA Choice agrees "that it is a line's actual capabilities, not its use, that govern . . . taxability." Pl.'s Post-Tr. Reply at 8. This criterion properly governs applicability of Subsection 4252(a). *See Comdata*, 21 Cl. Ct. at 130-31 (rejecting a taxpayer's argument that "incidence of the tax is governed not by the capability of the service provided but rather by the actual use made of it," instead focusing on whether the service had an "inherent use limitation"); Rev. Rul. 79-245, 1979 WL 51191 ("Where a telephone service provides the subscriber the privilege of telephonic quality communication with substantially all other subscribers to the local telephone system, it is immaterial whether the subscriber exercises the privilege."). If the services were configured such that USA Choice could initiate an outgoing call even if it had to use special customer-provided equipment such as a multiplexor or PBX, *see supra*, at 20 n.24, then USA Choice had the privilege or ability to "communicate with" whomever it chose to call. With the incoming-only circuits, however, it did not.

3. *Application of Subsection 4252(a) to particular services.*

A preponderance of the evidence establishes that the ALLTEL PRA services were configured by ALLTEL to only be incoming-only. According to Dr. Hills, PRI services for internet service providers "are generally configured to be . . . 'incoming only.'" DX 2 at 4. The ALLTEL tariff explicitly provided that the B channels could be dedicated as "incoming" only. ALLTEL PRA tariff at Original Sheet 22, ¶ 10.3.3(B). While Dr. Hills did acknowledge the possibility that a particular PRI service might be configured differently, Tr. 235:4-8, no evidence suggests that the ALLTEL PRA services were actually configured to be other than incoming-only. Notably, a review of the invoices does not show any charges for outgoing calls. *See* PX 5 at 3-60, 222-44, 273-305C, 353-58, 368-372.

Likewise, the evidence establishes that all but one of the Verizon IntelliLinQ PRI services were configured to be incoming-only. The Verizon tariff specifically provided an incoming-only configuration as an option. *See* Verizon IntelliLinQ PRI tariff at 1st Revised Sheet 4, ¶ B.3. According to Dr. Hills, the per-channel charges for three of the telephone numbers for which detail was provided corresponded to the incoming-only configuration. Tr. 230:11 to 231:14-15; PX 9. With one exception, there was no evidence that any of the other telephone numbers were configured differently, and USA Choice thus has established that those Verizon IntelliLinQ services were more likely than not also configured as incoming-only. One of the associated telephone numbers showed a long distance service charge. *See* PX 8. Even though no charges for actual calls were shown, that absence suggests a limitation on use, not capability. *See Comdata*, 21 Cl. Ct. at 130-31. Plaintiff's counsel's attribution of the long distance charge to a billing error, Tr. 62:8-24, may well be correct but it is unsupported by evidence. Accordingly, the court determines that USA Choice has not established that the service for 814-227-2694 was configured as incoming-only.

The Sprint PRI service was not established to be incoming-only. According to Dr. Hills, the Sprint PRI service made its channels "explicitly available for outgoing calls." Tr. 213:13 to 214:2. Whether the channels would carry inward, outward, or both types of communications was controlled by USA Choice's own equipment. *See* Sprint PRI tariff at 2d Revised Page 21, ¶ 5.3.6.A.1. Similarly, the ALLTEL BRA was not established to be configured as incoming-only. As the government points out, Def.'s Post-Tr. Resp. at 4, the tariff explicitly "[a]llows the user to originate *and* receive" calls. ALLTEL BRA tariff at 2d Revised Sheet 1, ¶ 10.1.1(C)(1) (emphasis added).

The Digital Channel Services present a more difficult factual question. An ALLTEL DCS invoice includes as a line item description "DIRECT IN DIAL TRUNK." PX 5 at 1B. USA Choice suggests this phrase should be deemed to mean "inward dial only." Pl.'s Post-Tr. Br. at 26. An "inward trunk" is "[u]sed only for incoming calls" and "cannot dial out." *Newton's Telecom Dictionary* at 367. The government suggests "direct in dial trunk" means a "direct inward dial service." Def.'s Post-Tr. Resp. at 6. As noted previously, "direct inward dialing" ("DID") is "the ability for a caller outside a company to call an internal extension without having to pass through an operator or attendant." *Newton's Telecom Dictionary* at 212.[27] Dr. Hills testified he "would have every expectation this service would allow outgoing calls." Tr. 199:25 to 200:4, 200:22-23. However, according to *Newton's*, "[t]raditionally, DID lines could not be used for outdial operation, since there was no dial tone offered. More recently, the individual channels in a T-1 trunk can be defined in terms of their directional nature, with some being defined as DID, some as DOD (Direct Outward Dialing), and some as combination (both incoming and outgoing)." *Newton's Telecom Dictionary* at 205. Based on USA Choice's intent in procuring the services and the traditional definition of direct inward dialing, the court concludes the "direct in dial trunk" was more likely than not configured to be incoming-only.

The government urges that if the court were to find the "direct in dial trunk" to be incoming-only, the court should find the ALLTEL "direct in dial trunk" was either separate from the forty-eight trunks USA Choice purchased or only one of the forty-eight trunks. Def.'s Post-Tr. Resp. at 6. The invoice shows the quantity "48" for the number of access charges applicable, but only the quantity "1" for the "DIRECT IN DIAL TRUNK." *See* PX 5 at 1B. The language of the tariff indicates the words "trunk" and "channel" are used interchangeably. *See* ALLTEL DCS tariff at First Revised Sheet 20, ¶ 10.2.5(B) ("For each channel activated a trunk charge will be applied."). USA Choice's concession that all but one account for the ALLTEL DCS service was not direct inward dial, Cl. Tr. 16:18 to 17:15, supports that the ALLTEL DCS service would allow outgoing calls unless a specific charge was made for the "direct in dial" configuration.[28]

---

[27]Notably, "DID is different from a DIL (Direct-In-Line) where a standard, both-way central office trunk is programmed to always ring a specific extension or hunt group." *Newton's Telecom Dictionary* at 205.

[28]USA Choice's counsel explained that the concession reflected a business decision by USA Choice, which had acted on the premise "that if [it] wanted direct inward dial, [it] ha[d] to

The court concludes, based on this evidence, that one of the forty-eight ALLTEL DCS channels was configured as an incoming-only direct in dial trunk. The remaining forty-seven channels were configured also to permit outgoing calls.

USA Choice similarly has not proven by a preponderance of the evidence that the Verizon DCS service was configured to be incoming-only. Dr. Hills testified these services provided the capability of originating outgoing calls. Tr. 220:15-16, 222:3-4. The invoices reflect a seven dollar per channel charge, *see, e.g.*, DX 8, which corresponds to the charge the tariff announces for "measured service." Verizon DCS tariff at First Revised Sheet 9, ¶ A.6.c(1)(b); *see also* Tr. 221:15 to 222:15 (Test. of Hills). This indicates the ability to make outgoing calls. Additionally, next to the "Access Line/Trunk or CentraNet Line – flat rate" charge, the tariff includes the notation "SA TRK, SA DIDTRK, SA DODTRK, SA CN." *See* Verizon DCS tariff at First Revised Sheet 9, ¶ A.6.c(1)(a). Presumably, "DIDTRK" and "DODTRK" refer to direct indial trunk and direct outdial trunk, respectively. Next to the "Access Line/Trunk or CentraNet Line – measured service" charge, the tariff includes the notation "SA TRKUSS, SA DODTRKUSS, SA CNUSS." *See id.* at First Revised Sheet 9, ¶ A.6.c(1)(b). Absent from this second set of notations was a "DIDTRK," suggesting the measured service charge would not be applicable to direct indial trunks. The invoices also showed charges for direct dialed calls, *see, e.g.*, PX 5 at 168, and voicemail services, *see, e.g., id.* at 169, suggesting that USA Choice did not use the Verizon DCS service exclusively for incoming dial-up internet customers. Thus, the Verizon DCS service purchased by USA Choice constituted taxable local telephone service unless charges for that service were exempt under the "private communication service" exemption.[29]

---

pay more money." Cl. Tr. 16:16-17.

[29]USA Choice raises yet a further ground for a refund by arguing that a principle it styles as the "Doctrine of Equality of Treatment" entitles USA Choice to relief because of the conclusion the IRS reached in a private letter ruling ("PLR") issued to another taxpayer. Pl.'s Post-Tr. Br. at 35-36 (referring to I.R.S. Priv. Ltr. Rul. 200133008 (Aug. 17, 2001) ("PLR 200133008"), *revoked by* I.R.S. Priv. Ltr. Rul. 200242021 (Oct. 18, 2002). According to USA Choice, the other taxpayer was in an "identical . . . situation." Pl.'s Post-Tr. Br. at 37. While "[a] taxpayer may not rely on an advance ruling issued to another taxpayer," Treas. Reg. § 601.201, a letter ruling can be considered by a court when determining whether the IRS has abused its discretion in proscribing retroactive application of such a ruling under I.R.C. § 7805(b)(8). *See Vons Cos. v. United States*, 51 Fed. Cl. 1, 10 (2001) (explaining *International Bus. Machs. Corp. v. United States*, 343 F.2d 914 (Ct. Cl. 1965)). I.R.C. § 7805(b)(8) provides that "[t]he Secretary may prescribe the extent, if any, to which any ruling (including any judicial decision or any administrative determination other than by regulation) relating to the internal revenue laws shall be applied without retroactive effect." The doctrine that USA Choice seeks to invoke, to the extent it was recognized in *International Business Machines*, has been, as the Federal Circuit observed, "effectively limited to its facts by subsequent decisions of the Court of Claims in *Knetsch v. United States*, 348 F.2d 932 (Ct. Cl. 1965) and *Bornstein v. United States*, 345 F.2d

## B. The "Private Communication Service" Exemption From the Excise Tax on Local Telephone Service

As noted *supra,* Congress has excluded from the definition of "local telephone service" operations that meet the definition of a "private communication service." Thus, for purposes of this case, those services that would otherwise be classified as a "local telephone service" would nonetheless be exempt from the communications excise tax if they were to meet the requirements of a "private communication service." Here, those services that were "local telephone service" but nonetheless might be "private communication service" consist of USA Choice's ALLTEL DCS service, ALLTEL BRA service, Verizon DCS service, and Sprint PRI service.

The tax-exempt "private communication service" is defined as follows:

> **(d) Private communication service.**—For purposes of this subchapter, the term "private communication service" means—
>
> **(1)** the communication service furnished to a subscriber which entitles the subscriber—
>
> **(A)** to exclusive or priority use of any communication channel or groups of channels, or
>
> **(B)** to the use of an intercommunication system for the subscriber's stations,

---

558 (Ct. Cl. 1965)." *Florida Power & Light Co. v. United States*, 375 F.3d 1119, 1125 (Fed. Cir. 2004). Specifically, the application of *International Business Machines* does not extend beyond situations where

> (i) two or more taxpayers in direct economic competition have each applied for a ruling and only one has received a favorable ruling; and (ii) the taxpayer denied the favorable ruling is arguing that the Commissioner abused his discretion under section 7805(b) by failing to apply a new legal position only prospectively.

*Vons Cos.*, 51 Fed. Cl. at 10 (applying *Knetsch*, 348 F.2d at 940 & n.14; *Bornstein* 345 F.2d at 564 n.2). USA Choice has not established that it was in direct economic competition with the recipient of PLR 200133008 or that it applied for its own ruling. Moreover, the recipient of PLR 200133008 was a supplier to internet service providers, not itself an internet service provider. PLR 200133008. USA Choice's assertion that its refund request "had the same effect as requesting a letter ruling," Pl.'s Post-Tr. Br. at 37, is contrary to the Federal Circuit's decision in *Florida Power & Light.* Though the taxpayer in *Florida Power & Light* made a refund request to the IRS, 375 F.3d at 1120-21, the Federal Circuit held that taxpayer was unable to invoke *International Business Machines* because it had "never sought a private letter ruling from the IRS." 375 F.3d at 1125.

In all events, USA Choice's equality-of-treatment contention is largely moot because this court is acting on other bases to award relief to USA Choice for taxes it paid on incoming-only and private-communication services. *See Deluxe Corp. v. United States*, 885 F.2d 848, 853 (Fed. Cir. 1989).

> regardless of whether such channel, groups of channels, or inter-communication system may be connected through switching with a service described in subsection (a), (b), or (c),
>
> (2) switching capacity, extension lines and stations, or other associated services which are provided in connection with, and are necessary or unique to the use of, channels or systems described in paragraph (1), and
>
> (3) the channel mileage which connects a telephone station located outside a local telephone system area with a central office in such local telephone system,
>
> except that such term does not include any communication service unless a separate charge is made for such service.

I.R.C. § 4252(d). USA Choice asserts that some of the services at issue fall within this definition. *See* Pl.'s Post-Tr. Reply at 12 (identifying the "exclusive or priority use" provision of Subparagraph 4252(d)(1)(A) as the portion of the "private communication service" definition USA Choice seeks to apply).

1. *"[P]rivate" not limited to internal communications only.*

The government seeks to demonstrate that the services at issue do not qualify as private-communication services because they are not used exclusively for internal communications within USA Choice's operations. *See generally* Def.'s Post-Tr. Br. at 16-20. In support, the government states "the legislative history makes it clear that § 4252(d) was designed to exempt from the federal excise tax services used by businesses for 'internal communications.'" Def.'s Post-Tr. Br. at 16 (discussing H.R. Rep. No. 89-433 (1965), *as reprinted in* 1965 U.S.C.C.A.N. 1645). However, the statute defines several different types or categories of private-communication service, *see Western Electric Co. v. United States*, 564 F.2d 53, 62 (Ct. Cl. 1977), not just the type to which the government refers. The statutory exemption must be construed to give effect to all of its terms, not just those that relate to the cited legislative history. "'It would be a strange canon of statutory construction that would require Congress to state in committee reports . . . that which is obvious on the face of a statute.'" *Whitfield v. United States*, 543 U.S. 209, 216 (2005) (quoting *Harrison v. PPG Indus.*, 446 U.S. 578, 592 (1980)).

The government more specifically argues that the "private communication component of the plaintiff's network" was limited to "the aggregation and routing of internet traffic over plaintiff's network of computer servers," Def.'s Post-Tr. Br. at 19, and that the services at issue were neither "necessary" nor "unique" to that network and did not make the USA Choice's use of that network any "easier or more convenient." Def.'s Post-Tr. Br. at 19-20. Along a similar vein, the parties direct some of their arguments to the question of whether the services at issue fall under the definition of a private line offered by Dr. Hills, *viz.*, a "service . . . not connected to

local exchange services or toll services." Def.'s Post-Tr. Resp. at 17; *see* Tr. 268:14-16.[30] USA Choice maintains that the definition of "private communication services" includes more than just "private lines," Pl.'s Post-Tr. Br. at 30-32, and in this respect, the government agrees that Dr. Hill's definition of a private line is "different from the statutory definition of 'private communication service.'" Def.'s Post-Tr. Resp. at 17. Indeed, the very language of the statute ("*regardless* of whether such channel . . . may be *connected through switching* with a service described in subsection (a), (b), or (c)," I.R.C. § 4252(d)(1) (emphasis added)), confirms that tax-exempt "private communications service" is broader than "private lines." *See Western Electric*, 564 F.2d at 65.

USA Choice claims the services at issue have attributes of private lines, citing specifically the DS-1 technology which it avers "is generally associated with a private line" and that the telephone numbers were apparently unlisted. Pl.'s Post-Tr. Br. at 34.[31] The government responds "the services at issue . . . do not . . . fall within Dr. Hill's definition of 'private line' because the DS-1 lines providing the service were connected to the local exchange service." Def.'s Post-Tr. Resp. at 17. The government also focuses on the connection with the central office in directing the court's attention to Revenue Ruling 78-437, 1978 WL 42231. Def.'s Post-Tr. Resp. at 18. According to the government, the IRS determined in Revenue Ruling 78-437 that "phone lines that connected [a taxpayer's] private branch exchange to the central office of the local telephone company did not constitute private communication service because they were not necessary or unique to the private communication service and were provided in connection with the local telephone service." Def.'s Post-Tr. Resp. at 18.

Revenue Ruling 78-437 analyzes a central office line charge in the context of qualifying as a private communication service under the second part of the private-communication exemption, I.R.C. § 4252(d)(2) ("associated services which are provided in connection with, and

---

[30]An alternative definition of a "private line" is "[a]n outside telephone line, with a separate telephone number, which is separate from the PBX. The line is a standard business line which goes around the PBX. It connects the user directly with the LEC central office, rather than going through the PBX. Private line connections are considered to be very 'private' by virtue of the fact that it is not possible for a third party (*e.g.*, technician or console attendant) to listen to conversations without placing a physical tap on the circuit. Additionally, private lines are not subject to congestion in the PBX." *Newton's Telecom Dictionary* at 550. *See also id.* (defining "private line service" as "[a]n outside telephone number separate from the PBX, can be set up to appear on one of the buttons of a key telephone."). The *Telecommunications Glossary* notes, "[a]mong subscribers to the public switched telephone network(s), the term '*private line*' is often used to mean a one-party switched access line." *Telecommunications Glossary* at P-23.

[31]"DS-x," with "x" being a number from zero to 4, refers to a "Digital Signal (level)." *Newton's Telecom Dictionary* at 227. "The fundamental speed level is DS-0 (64 kbps [kilobits per second] . . . ), which is a voice grade channel." *Id.* "In North America, . . . DS-1 becomes T-1, DS-2 becomes T-2, and so on." *Id.*

are necessary or unique to the use of, channels or systems described in paragraph (1)"), not services under the first part of the exemption, I.R.C. § 4252(d)(1)(A) ("the exclusive or priority use of any communication channel or groups of channels").[32] In addition to lacking any consideration as to whether the service entitled the taxpayer to "exclusive or priority use of any communication channel," there is no indication in the revenue ruling's recitation of facts that the central office line charge was separate from a charge for access to the local telephone system. *See* Rev. Rul. 78-437, 1978 WL 42231.

2. *"[E]xclusive or priority use of any communication channel or groups of channels."*

Whether a service qualifies as a private communication service in this instance largely turns on whether the service "entitles [USA Choice] to exclusive or priority use of any communication channel or groups of channels." I.R.C. § 4252(d)(1)(A). As USA Choice would have it, "[i]f USA Choice and its customers . . . have the privilege of the use of the channels . . . , superior to others in the local calling area, then the [channels] are 'private communication service.'" Pl.'s Post-Tr. Br. at 32. USA Choice argues that it "purchased the circuits [with the] intent to 'get some quantity of dedicated circuits so that [its] customer[s] [could] call into [its] network.'" *Id.* at 33 (quoting Tr. 159:19-21 (Test. of Phillips)). USA Choice argues that by terminating a call when a caller fails to properly authenticate that he or she is a USA Choice customer, USA Choice demonstrates its priority of use. Pl.'s Post-Tr. Br. at 33. Therefore, according to USA Choice, the services at issue entitle USA Choice to priority use of communication channels.

The government maintains that USA Choice "has the exclusive or priority use of *one end* of the line [but] does not have exclusive or priority use of the *channel* because anyone can dial the associated phone number and use the channel to communicate with" USA Choice. Def.'s Post-Tr. Br. at 17-18. This argument creates an artificial distinction. A "line" is a "physical medium for transferring electrical or electromagnetic energy from one point to another for purposes of communications." *Telecommunications Glossary* at L-5. A channel, "a connection between initiating and terminating nodes of a circuit," *Telecommunications Glossary* at C-9, uses a line. A node is defined as the "terminal of any branch of a network or an interconnection common to two or more branches of a network," *Telecommunications Glossary* at N-7. The nodes between which the services at issue provide communications channels are USA Choice's POPs and the local telephone company's central office. The government is correct that USA

[32]Revenue Ruling 78-437 specifies that it focused on the second part of the exemption: "The central office line charge is a charge of the lines that give access to the local telephone service. Since the lines are not necessary to the private communication service, but are provided in connection with local telephone services, this charge is not within the exemption provided by section 4252(d).").

Choice did not have *exclusive* use of the communication channels at issue,[33] but the dispositive question is whether USA Choice was entitled to *priority* use of the channels.

The government asserts the services at issue are indistinguishable for purposes of the "priority use" inquiry from the "regular analog telephone service" a homeowner might purchase. Def.'s Post-Tr. Br. at 17 (arguing USA Choice "did not have exclusive or priority use . . . any more than" a homeowner might have). In doing so, the government ignores that so-called "regular analog telephone service," unlike some of the services at issue, does not provide a specially configured circuit for which there is a separate charge in addition to a charge for access to the local exchange. The government reaches even further afield in arguing that USA Choice "did not have 'priority' use of the lines" because other local telephone system subscribers could use the phone lines to call USA Choice's modems "without deferring to plaintiff's use of the lines." Def.'s Post-Tr. Resp. at 18. The government ignores that the services at issue provide channels that another telephone subscriber could effectively use only to call USA Choice for internet access if the subscriber was one of USA Choice's customers. These were not lines where multiple telephone service subscribers would share the same loop on an equal basis. *See Telecommunications Glossary* at P-3. USA Choice was not required to yield to anyone in its use of these communication channels.

3. *Use by the communication service "subscriber."*

The government points to the language of the statute ("communication service furnished to a *subscriber* which entitles the *subscriber* . . . to exclusive or priority use," I.R.C. § 4252(d)(1) (emphasis added)), and argues that USA Choice alone, not USA Choice and its customers, is the subscriber to the services at issue. Def.'s Post-Tr. Resp. at 15. This ignores that the use by USA Choice's customers of the channels at issue is by dint of their relationship with USA Choice. A dial-up customer pays money to USA Choice, and USA Choice adds to its database the dial-up customer's username and password, allowing the customer to establish and maintain an internet connection. Every time a dial-up customer connects to USA Choice over these channels, USA Choice is using the channels to provide a service to its customers.

---

[33]The government, to support its position that the services did not provide "exclusive" use, argues the ability of non-USA Choice customers to "access plaintiff's phone lines by dialing the associated phone number" renders the "use of the lines [to be] not in plaintiff's exclusive control." Def.'s Post-Tr. Resp. at 15-16. The government argues that USA Choice "did not have 'exclusive' use of the lines" because it lacked the "power to exclude." *Id.* at 18. The government thus would make a distinction between termination of unwanted calls and the ability to prevent unwanted calls in the first instance. *Id.* at 15-16. This distinction might suffice to show that USA Choice did not enjoy "exclusive" use of the channels but it does not show that USA Choice did not have "priority" use.

4. *A "separate charge."*

To qualify for the private-communication exemption, "plaintiff must show that it paid 'a separate charge'" for the services. *Western Electric*, 564 F.2d at 58. USA Choice avers that the channels are invoiced as "non-basic service," separate from "basic service." Pl.'s Post-Tr. Br. at 34-35. According to Mr. Phillips, the "basic service" charges covered only the telephone number. Tr. 49:21-23, 54:25 to 55:1, 55:6-14.

The ALLTEL DCS invoice categorizes all charges as "basic service" but under that heading lists separate charges for the "access charge" and the "DCS Digital ACC facility." PX 5 at 1B. Thus, ALLTEL charged USA Choice for the DCS facilities separately from the access charges related to local telephone service. Similarly, for the BRA service ALLTEL provided USA Choice at Brookville, ALLTEL charged USA Choice separately for the BRA service, differentiating between charges for the basic service (the telephone number) and for the non-basic service (the advanced digital service). PX 5 at 245-272. In addition, the government's expert, Dr. Hills, described services provided by ALLTEL on two lines, 825-512-0339 and 825-513-0397, as being for "private line[s]." Tr. 262:15-17; DX 3 at 2. The government concedes that a refund is appropriate for the excise tax paid on the charges for these lines. Def.'s Resp. at 24. Accordingly, USA Choice is entitled to a refund of communications excise tax paid on the charges that relate to the ALLTEL DCS and BRA facilities and to telephone numbers 825-512-0339 and 825-513-0397.

The Verizon invoice for the IntelliLinQ service showing the long distance service charge does not show a separate charge for the communication channels or groups of communication channels separate from local telephone service. *See* PX 8 at 3. Similarly, the Sprint PRI invoices do not show separate charges for local telephone service from the "ISDN voice/data channel" charges. *See* PX 5 at 61-64. Therefore, no refund of the corresponding tax is appropriate for those services.

**C. The Excise Tax on Toll Telephone Service**

When USA Choice filed its claim for refund of excise taxes with the IRS, the explanation USA Choice attached to Form 8849 described the claim for refund as involving "dial up access and ISP network lines." Complaint at Ex. A (Form 8849). Specifically, USA Choice averred "the purchases by the [t]axpayer included in this refund request were exclusively for the [t]axpayer's customer access to the internet." *Id.* USA Choice now also seeks a refund of the communications excise taxes it paid for toll telephone (long distance) service.[34] USA Choice has

---

[34]Respecting the toll-telephone charges, USA Choice may not invoke the refund procedure the IRS established in Notice 2006-50, 2006-25 I.R.B. 1141, in which the IRS announced its acquiescence in court decisions holding that, under I.R.C. § 4252(b)(1), taxable toll telephone service did not include those services for which a toll charge did not vary in amount according to both the distance and duration of calls. *See American Bankers Ins. Group v.*

not satisfied the jurisdictional prerequisites for bringing that particular claim before this court. USA Choice did not raise with the IRS its claim for a refund as to toll telephone service, and that claim "substantially varies" from the claims it did raise such that it cannot now be considered. *See Lockheed Martin*, 210 F.3d at 1371.

## CONCLUSION

For the reasons stated, USA Choice is awarded judgment for refund insofar as it paid communications excise taxes from January 1999 through April 2002 on incoming-only PRI channels purchased from ALLTEL and Verizon and its predecessors and on private-communication DCS and BRA channels obtained from ALLTEL plus the private lines associated with telephone numbers 825-512-0339 and 825-513-0397. Charges for these channels and services are not taxable as local telephone service, in the first instance because the services are not covered by the definition of such service in the Internal Revenue Code, and in the second instance because the services are exempted from the definition.

Because USA Choice has prevailed only in part, the parties shall confer in an endeavor to resolve the specific amount of the refund due and shall submit a reckoning of the amount on or before December 10, 2006, by agreement if possible, or separately, if agreement is not possible. Final judgment will thereafter be entered.

IT IS SO ORDERED.

Charles F. Lettow
Judge

---

*United States*, 408 F.3d 1328 (11th Cir. 2005); *OfficeMax, Inc. v. United States*, 428 F.3d 583 (6th Cir. 2005); *National R.R. Passenger Corp. v. United States*, 431 F.3d 374 (D.C. Cir. 2005); *Fortis v. United States*, 447 F.3d 190 (2d Cir. 2006); *Reese Bros. v. United States*, 447 F.3d 229 (3d Cir. 2006); *America Online*, 64 Fed. Cl. at 577-78. The IRS, in Notice 2006-50, sets forth a procedure by which taxpayers filing income tax or certain information returns may request a credit or refund for an excise tax erroneously collected under I.R.C. § 4252(b)(1). Notice 2006-50 § 5. This procedure applies only to "tax paid on services that were billed to customers after February 28, 2003." *Id.* § 1(b). All the invoices presently at issue precede that date. Accordingly, Notice 2006-50 would not provide USA Choice with an avenue for relief regarding these amounts.