Expedient Joint Status Report Attachment

# In The United States Court of Federal Claims

No. 05-515T

(Filed: August 17, 2007)

__________

| | | |
|---|---|---|
| COMCATION, INC., | * | Trial; Excise tax refund suit; Internet |
| | * | service provider – use of primary rate |
| Plaintiff, | * | interface (PRI) services lines to connect |
| | * | customers from different local telephone |
| v. | * | systems to network; Communications |
| | * | excise tax of section 4251 of the Internal |
| THE UNITED STATES, | * | Revenue Code of 1986; PRI lines taxable |
| | * | as “local telephone service” within the |
| Defendant. | * | meaning of section 4251(b) of the Code; |
| | * | PRI lines not exempt from tax as a “private |
| | * | communications service” within the |
| | * | meaning of section 4252(d) of the Code; |
| | * | *USA Choice* not followed. |

__________

**OPINION**

__________

*Anthony Gulotta,* Anderson and Gulotta, P.C., Harrisburg, Pennsylvania, for plaintiff.

*Jacob Earl Christensen*, United States Department of Justice, Washington, D.C., with whom was *Assistant Attorney General Eileen J. O’Connor*, for defendant.

**ALLEGRA, Judge:**

Following a trial in Washington, D.C., at issue before the court is whether the Federal communications excise tax applies to certain services purchased by an Internet Service Provider (ISP) from 1998 through 2002. More specifically, the question is whether such services involved the provision of “local telephone service” within the meaning of sections 4251(b)(1)(A) and 4252(a) of the Internal Revenue Code of 1986 (26 U.S.C.) (the Code). For the reasons that follow, the court finds that the services in question are subject to this excise tax.

## I. FINDINGS OF FACT

Based on the record, including the parties’ stipulation of facts, the court finds as follows:

Comcation is an ISP located in Doylestown, Pennsylvania, delivering internet access to customers in southeastern Pennsylvania, including Philadelphia. In support of its business,

Comcation maintains facilities called Points of Presence (PoPs) in multiple locations in Pennsylvania. During the years in question, a Comcation customer accessed the Internet as follows: First, the customer used its computer's modem to dial Comcation's local telephone number associated with a PoP. The customer's modem converted the computer's digital signal into an analog signal for transmission through the local loop to the local telephone company's central office that serviced Comcation's Primary Rate Interface (PRI) service lines. The use of the PRI lines allowed plaintiff's customers to contact it without incurring long distance charges. Upon reaching the local telephone company's central office,[1] the dial-up customer's signal was reconverted into a digital representation and then transmitted through the PRI lines to Comcation's modems in Doylestown. Once the dial-up user's signal reached Comcation's modem, it answered the call, at which point, Comcation's network access and authentication servers determined if the caller was an authorized user. If the dial-up user's username and password were valid, then the servers provided that user with access to Comcation's network and, ultimately, the Internet; if the dial-up user's information was invalid, the aforementioned servers dropped the call.

Between October 1, 1998, and February 2, 2002, Comcation purchased the necessary PRI service lines from five telecommunication carriers (some of which were successor companies to others): Bell Atlantic, Verizon, TCG, AT&T, and XO Communications.[2] Unlike regular phone service, which is analog, PRI is a digital service that uses a T-1 circuit[3] with 24 channels – one signal channel and 23 bearer channels that can be used simultaneously by up to 23 different customers. The PRI lines are of telephonic quality and allow anyone in the local telephone system to initiate a local telephone call to Comcation's network access server. The channels provided through PRI service can be configured in various ways – they may be solely incoming, solely outgoing, or bidirectional, and, indeed, may even be configured on a call-by-call basis. While calls cannot be initiated on an incoming channel, once a call is established, communication flows two-ways, allowing a dial-up user to both send and receive information through the ISP's network. When Comcation's president, Calvin Mitchell Smith, requested PRI services from telephone companies, he asked for inward dial-only lines, as outgoing lines were not needed for plaintiff's ISP business.

---

[1] The central office is a major equipment center that connects the lines that physically run to the homes and businesses in the public telephone system for a specific geographic area and contains switching equipment to interconnect the lines with other networks.

[2] Initially, Comcation purchased their PRI services from Bell Atlantic, later known as Verizon; and then from TCG, later consolidated into AT&T. Eventually, Comcation purchased all of its PRI services from XO Communications.

[3] According to a definition provided in the report of defendant's expert, a T-1 line is "[a] digital transmission link with a total signaling speed of 1.544 Mbps (1,544,000 bits per second), which may be divided into up to 24 separate voice-quality channels, or which may be utilized as a single two-way high speed data stream."

The PRI service provided by Bell Atlantic, IntelliLinQ, was offered in either a basic or enhanced form, with plaintiff most likely having purchased the enhanced version.[4] The PRI service Comcation purchased from Bell Atlantic generally used two central offices for each call – Doylestown and the relevant PoP office accessed by the caller. Comcation was charged a flat monthly rate for the PRI lines that depended on the distance from the central office at each PoP location to the Doylestown office. Because Bell Atlantic utilized flat rates, invoices from this company did not reflect the details of the calls that were made.

The PRI service Comcation purchased from TCG, was the Primeconnect DID Multirate CTR and ISP PRI Arrangement, which allowed Comcation to use one PRI line to aggregate customer calls from four different PoP locations. The invoices from TCG indicated that the service was "DID," meaning direct inward dial, and "ISP/PRI," which usually means incoming call service. But, those bills lacked any call detail. This service, the billing rate and the nature of the billing invoices remained essentially the same when AT&T acquired TCG.

Eventually, XO Communications became Comcation's service provider, chosen primarily based on cost considerations. XO billed Comcation for its use of 12 PRI lines. XO's rates were not dependant on the distance between the PoP used by the caller and Doylestown, but rather were set at $500 per month. No XO tariffs for the time period at issue were produced by the parties. A XO tariff from a later year includes the same language as the Bell Atlantic tariff regarding the service's capability for two-way versus incoming-only service.

The vendors from whom plaintiff purchased its PRI line service collected the Federal communications excise tax on that service. On February 27, 2002, plaintiff filed a request for a refund with the IRS in the amount of $15,000. On April 27, 2004, plaintiff received notification that its claim had been disallowed. On May 4, 2005, plaintiff filed its complaint in this case.

---

[4] The record contains tariffs that describe some of the services that plaintiff purchased. For example, as to the Enhanced Intelli-LinQ PRI Hub service, the relevant tariff (for the year 2000) stated –

> Enhanced IntelliLinQ PRI Hub service is a Telephone Company-designed LATA-wide network service which allows ISRAPS [Information Services Remote Access Providers, also know as Internet Service Providers] to provide their end user customers with single-number dial-up access to the 1SRAF"s premises location. The service utilizes strategically located single-number-service hub offices to collect and route traffic using Advanced Intelligent Network features to predetermined points of interconnection, from where the traffic is routed to the ISRAP's premises location over dedicated facilities.

This tariff specifically indicated that this service could be "provisioned as two-way service or incoming-only service."

Plaintiff seeks a refund of $6,055.38 in taxes for purchases from Bell Atlantic, $1,726.62 for purchases from TCG, and $2,379.16 for purchases from XO Communications.

On September 11, 2007, trial was held in this case in Washington, DC. During that trial, defendant's expert, Dr. Michael Hills, who is the president of a company that provides network design services to ISPs, testified that he was unaware of any cost differentials between configuring a PRI line as allowing incoming calls, outgoing calls, or both. He further stated that for the year 2000, it was probable that PRI lines purchased by ISPs would be provisioned as incoming-only by telephone companies. Neither he nor Mr. Smith had personal knowledge as to how the PRI lines in question were actually provisioned. Post-trial briefing occurred in November and December of 2006, followed by closing argument on January 9, 2007.

## II. DISCUSSION

Congress imposed the first excise tax on telephone services as part of the Spanish War Act of 1898, barely 22 years after the telephone had been invented. *See Officemax, Inc. v. United States*, 428 F.3d 583, 585 (6th Cir. 2005). Over the years, as technology evolved, Congress periodically revisited this tax – for example, in 1932, adding cable dispatches. Pub. L. No. 154, § 701, 47 Stat. 169, 270.[5] The last major revision of the communication excise tax occurred in 1965, when, as part of the Excise Tax Reduction Act of 1965, Pub. L. No. 89-44, 79 Stat. 136, 145-46 (1965), Congress amended section 4251(a) of the Code, which imposes a three percent excise tax on "communications services."

Included within these "communication services" are "local telephone services," 26 U.S.C. § 4251(b)(1)(A), which, in turn, are defined as:

> (1) the access to a local telephone system, and the privilege of telephonic quality communication with substantially all persons having telephone or radio telephone stations constituting a part of such local telephone system, and
>
> (2) any facility or service provided in connection with a service described in paragraph (1).

26 U.S.C. § 4252(a). Excluded from the phrase "local telephone service" is any service that is a "toll telephone service" or a "private communication service" as defined in section 4252(b) and (d), respectively. *See Reese Bros, Inc. v. United States*, 447 F.3d 229, 233 (3d Cir. 2006); *Western Elec. Co. v. United States*, 564 F.2d 53, 55 (Ct. Cl. 1977). "Toll telephone service" means, in relevant part, a "telephonic quality communication for which . . . there is a toll charge which varies with the distance and elapsed transmission time of each individual communication."

---

[5] *See also* Louis Alan Talley, The Federal Excise Tax on Telephone Service: A History (Cong. Research Serv. 2001) (available, as viewed on July 30, 2007, at budget.senate.gov/ democratic/crsbackground/teltax.pdf ) (hereinafter "Excise Tax History").

26 U.S.C. § 4252(b)(1). A "private communication service" entitles the subscriber, *inter alia*, to the "exclusive or priority use of any communication channel or groups of channels" or "to the use of an intercommunication system for the subscriber's stations." *Id.* at § 4252(d); *see also Western Elec. Co.*, 564 F.2d at 55.

Comcation asserts that the PRI line service it purchased to provide Internet access to its customers was not within the definition of "local telephone service" and should not be taxed as such. Not so, defendant contends, claiming that the PRI line service constituted taxable local service under the statute because it allowed anyone in the local exchange areas to place a local call and establish two-way communication of telephonic quality with Comcation's network. This is true, defendant argues, even if these lines were configured to allow incoming calls only. The conflicting positions of the parties beg several threshold questions regarding the proper scope of the statute, to which the court now turns.

A.

As with any issue involving a question of statutory construction, "the starting point . . . here must be the language and structure of the relevant statute[]." *FleetBoston Fin. Corp. v. United States*, 68 Fed. Cl. 177, 179 (2005), *aff'd*, 483 F.3d 1345 (Fed. Cir. 2007); *see also United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989); *Trans-Lux Corp. v. United States*, 696 F.2d 963, 966 (Fed. Cir. 1982) (applying this interpretative rule in construing 26 U.S.C. § 4252(c)). Where there is a doubt as to the meaning of the statutory language, "an examination of the legislative history, for whatever illumination it may shed, is necessary." *Ellis First Nat'l Bank of Bradenton v. United States*, 550 F.2d 9, 15 (Ct. Cl. 1977); *see also Ocean Drilling & Exploration Co. v. United States*, 988 F.2d 1135, 1156 (Fed. Cir. 1993).

Under section 4252(a)(1), a "local telephone service" must not only provide "access" to a local telephone system, but also the "privilege" to communicate with substantially all persons participating in that system. The term "privilege" connotes that the user of such a service must have the right to use equipment to communicate with substantially all the persons participating in the local telephone system. Construing this same term in the statutory definition of "toll telephone service," *see* 26 U.S.C. § 4252(b), this court explained in *Comdata Network, Inc. v. United States*, 21 Cl. Ct. 128 (1990), that "[i]n everyday speech, the word 'privilege' connotes right," adding that "the tax is applicable because the service provided plaintiff grants it the right to utilize the telephone lines" in the fashion specified by the excise tax. *Id*. at 130-31 (quoting XII the Oxford English Dictionary 522 (2nd ed. 1989)).[6] This plain-meaning reading is confirmed by the statute's legislative history, which states that "[t]he definition[] of local telephone service (previously general telephone service) . . . [has] been updated and modified to make it clear that

[6] The same observation was made in *In re WorldCom, Inc.*, 2007 WL 1576149 at * 5 (Bkrtcy. S.D. N.Y. Jun. 1, 2007); *see also USA Choice Internet Serv., LLC v. United States*, 73 Fed. Cl. 780, 792 (2006), *appeal pending*, No. 07-5077 (Fed. Cir. Feb. 8, 2007); Black's Law Dictionary 1234 (8th ed. 2004) (privilege: "[a] special legal right, exemption, or immunity granted to a person or class of persons").

it is the service as such which is being taxed and not merely the equipment being supplied." H.R. Rep. No. 89-433, at 30 (1965); S. Rep. No. 89-324, at 35 (1965); *see also Trans-Lux*, 696 F.2d at 968.

Nothing about the word "privilege" connotes that the service purchased must actually be used by the taxpayer in the fashion covered by the excise tax. Thus, section 4252(a) distinguishes between, on the one hand, inherent limitations associated either with the capacity of equipment or the contractual right to use it, and, on the other, those voluntarily associated with the way a given taxpayer chooses to use a particular service. As recently noted by another court construing this section –

> "Privilege" is clearly a more expansive concept than use. Privilege allows a certain act or use without regard to what is done in fact. . . .
>
> The inherent limitations of a purchased service, that is, its capabilities, define the privileges granted. If the purchased service is incapable of a certain use – so long as the taxpayer does not unilaterally determine that capability after purchase – it follows that the privilege to use the service in that fashion was not granted or purchased.

*In re WorldCom*, *Inc.*, 2007 WL 1576149 at * 5; *see also Comdata Network*, 21 Cl. Ct. at 131. Accordingly, a service is a "local telephone service" if a customer has the right to "telephonic quality communication with substantially all persons having telephone or radio telephone stations constituting a part of such local telephone system," whether or not it chooses to exercise that right fully.

As to the phone lines *sub judice*, the court finds that plaintiff purchased lines that were configured only for incoming services, anticipating that all calls were to be initiated by outsiders. While plaintiff's evidence on this point is somewhat sketchy and limited primarily to the testimony of its owner, Mr. Smith, that evidence, nonetheless, is essentially uncontroverted. Less clear is whether this incoming-call limitation was inherent in the PRI services purchased by plaintiffs or simply the product of how plaintiff itself decided to configure those lines. If plaintiff purchased the right to make outgoing calls, as well as to receive incoming calls, but instructed its vendors to configure those lines to only receive calls, then arguably it had both "access" to a local telephone service and the "privilege" to use that service to have telephonic quality communication with individuals within the given local telephone systems. In terms of the excise tax, there is little difference between plaintiff's choice to configure its lines in this fashion and its decision to have its authentication servers limit Internet access to its subscribers. Both choices – though perfectly understandable for a commercial ISP – resulted in self-imposed limits that did not fundamentally alter the nature of the services that plaintiff had the "privilege" to use. *De facto*, based on the record, it would appear that plaintiff acquired both the right to make and receive calls, but chose to configure its lines only to perform the latter task. While this finding might well be enough to trigger the tax in question, there is a more fundamental reason why the

communications tax should be imposed here, albeit one that requires the court to assume, *arguendo*, that plaintiff purchased a license only to receive calls from the individuals in the local telephone systems at issue.

Even with that assumption, the question remains – did that license authorize plaintiff to "communicate with" the members of the affected local telephone systems within the meaning of the statute? Plaintiff seems confident that it did not – essentially, it contends that it could not "communicate with" the local telephone system customers unless it had the privilege of initiating such contacts. But, nothing in the text of section 4242(a) explicitly conditions its coverage on who can initiate calls. Nor is that distinction somehow implicit in the statutory term "communication," which encompasses a range of activity or interactions, irrespective of the nature of the flow of information. *See* Black's Law Dictionary, *supra,* at 296 (communication is "the expression or exchange of information by speech, writing, gestures, or conduct; the process of bringing an idea to another's perception."); Dictionary.com., http://dictionary.reference.com/browse/ communication (as viewed on July 31, 2007) (communication: "the imparting or interchange of thoughts, opinions, or information by speech, writing or signs").[7] A plain reading of this term, rather, suggests that "communication" can occur even if the information flow is unidirectional or can be initiated only by one of two parties to the communication. *See*, *e.g.*, *Petsch-Schmid v. Boston Edison Co.*, 914 F. Supp. 697, 705 (D.Mass. 1996), *aff'd*, 108 F.3d 328 (1st Cir. 1997).

In this case, once a call was established on the PRI lines, two-way, telephonic-quality communication occurred. Information, in fact, flowed back and forth over these lines in at least two ways. First, as both parties acknowledge, plaintiff's network servers communicated with individuals seeking access to its Internet services, with those servers, for example, querying the computers of incoming callers for account information and passwords. Although this plainly was a form of communication, plaintiff asserts that it was *de minimis* and insufficient to trigger the excise tax. Even if that is true, the same cannot be said of the second form of information that flowed here – namely, that which occurred over the subject lines between various Internet sites and the local telephone system participants. As Dr. Hill indicated in his report, "once the call is established, the communication is two-way – a dial-up user needs to be able to receive information, as well as transmit it." This form of two-way communication cannot be overlooked simply because plaintiff decided to make it available only to subscribers. Had it not done so,

---

[7] The term "communication" has oft been construed in the context of the requirements for defamation, sometimes in the context of the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2674. *See Cooper v. Am. Auto. Ins. Co.* , 978 F.2d 602, 613 (10th Cir. 1992); *Jorgensen v. Mass. Port. Auth.*, 905 F.2d 515, 520 (1st Cir. 1990) (communication defined as "conduct that brings an idea to the perception of others"); *Jimenez-Nieves v. United States*, 682 F.2d 1, 6 (1st Cir. 1982) (same); *O'Ferrell v. United States*, 968 F.Supp. 1519, 1529 (M.D. Ala. 1997), *aff'd*, 253 F.3d 1257 (11th Cir. 2001) (same); Restatement (Second) of Torts § 559 cmt. a ("The word 'communication' is used to denote the fact that one person has brought an idea to the perception of another").

opening its conduit to the Internet to the public, then any member of the affected local telephone systems could have accessed its system and received various communications from the Internet over plaintiffs PRI lines. Seemingly, that should be enough to trigger the excise tax.

B.

Plaintiff, however, suggests that the statute focuses on who can initiate this flow of information, contending that it could not communicate "with" the members of the affected local telephone system unless it, and not just the callers, could initiate the communication – a concept we will call reciprocity. Plaintiff cites this court's recent decision in *USA Choice Internet Serv.*, *supra*, which also involved ISP lines that had been configured as inward-dialing only, in which the court concluded that those lines did not provide "local telephone service" within the meaning of section 4252(a)(1). In that court's view, this result hinged on the statutory language requiring that there be "communication ***with***" substantially all subscribers to the local telephone system, which language, the court asserted, connoted reciprocity, including the ability to both receive and initiate calls. 73 Fed. Cl. at 792 (emphasis in original). In reaching this conclusion, the court contrasted the language of section 4252(a)(1) with the definition of "toll telephone service"in section 4252(b)(2), noting that the latter provision referred to the privilege of an unlimited number of telephonic communications "to or from" persons in the specified service area, which language, the court concluded, encompassed incoming-only service. *Id*. Commenting on this, the court stated –

> The words "to or from" capture single-direction communications within their meaning, but the word "with" connotes reciprocity. As the definition of "with" in *Webster's Seventh New Collegiate Dictionary* 1026 (1970) indicates, "with" is "used as a function word to indicate one to whom a usu[ally] reciprocal communication is made."

*Id*. On this basis, the court rejected the notion that the ISP there had the privilege of communicating with substantially all the local telephone system subscribers, observing that "[c]ommunication cannot occur until the caller supplies a recognized username and password," adding that "[t]he transmissions of the identification request is so limited that it cannot be considered to be a 'telephonic quality communication' in the ordinary sense of those words." *Id*. at 794.

But, with all due respect, this court is not persuaded by this analysis for several reasons. First, the result reached in *USA Choice* case – that lines configured to be inward-dialing-only are not engaged in "communication with" substantially all the local telephone system subscribers – does not spring from an ordinary understanding of the word "with." While a single dictionary cited in *USA Choice* indicates that a communication "with" someone "usu[ally]" requires reciprocity, virtually every other lexicon defines "with" more broadly, as simply requiring that

some connection or association be established.[8] The isolated definition quoted in *USA Choice*, while undoubtedly cited in good faith, nonetheless, is an outlier and provides no basis for applying a "plain meaning" analysis of the statute – if anything, that analysis should proceed from the more broadly-accepted meaning of the term "with," which carries none of the restrictions *USA Choice* imposed. *See MCI Telecomm's Corp.*, 512 U.S. at 226-27 (peculiar definition did not create ambiguity where it was contained in "one dictionary whose suggested meaning contradicts virtually all others"); *see also* 2A Norman J. Singer, Statutes and Statutory Construction § 47:28 (2000). Indeed, one thing is eminently clear: no definition found by this court – not even that employed in *USA Choice* – even hints that for one person to be deemed in communication "with" another, both must be able to initiate the contact. And that, of course, is plaintiff's point here.

Second, *USA Choice's* narrowing construction of the phrase "communication with" clashes with how Congress has employed that phrase in several other statutes. *See Indus. Union Dept., AFL-CIO v. Am. Petroleum Inst.*, 448 U.S. 607, 718 n.30 (1980) (a word's "interpretation can be informed by other contexts in which Congress has used it"). One seeking evidence of this need go no farther than the Fair Debt Collection Practices Act (FDCPA), 15 U.S.C. §§ 1692-1692o, which repeatedly uses the phrases "communication with" or "communicate with" though plainly intending to refer to written communications flowing only in one direction – unsurprisingly, from a debt collector to the alleged debtor.[9] Notably, Congress has also

---

[8] *Compare* The American Heritage Dictionary of the English Language 1470-71 (1969) "in relationship"; "to; onto"); Black's Law Dictionary 1776 (4th ed. 1968) ("[a] word denoting a relation of proximity, contiguity, or association"); The Random House Dictionary of the English Language 1640 (1967) ("in some particular relation to (esp. implying interaction, company, association, conjunction, or connection"); The American College Dictionary 1401 (1962) ("in some particular relation to (esp. implying interaction, company, association, conjunction or connection"); Webster's Third New Int'l Dictionary 2626 (1961) ("used as a function word to indicate one to whom a communication or statement is made"; "used as a function word to indicate one that shares an action") *with* Webster's Seventh New Collegiate Dictionary 1026 (1970) ("used as a function word to indicate one to whom a usu. reciprocal communication is made"). In *MCI Telecomm. Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218, 228 (1994), the Supreme Court indicated that dictionaries issued around the time a statute is enacted are the most useful in ascertaining meaning.

[9] The FDCPA, 15 U.S.C. §§ 1692-1692o, "prohibits 'debt collector[s]' from making false or misleading representations and from engaging in various abusive and unfair practices." *Heintz v. Jenkins*, 514 U.S. 291, 292 (1995). The Act says, for example, that, in specified circumstances, a "debt collector" may not "communicate with a consumer in connection with the collection of any debt," unless, *inter alia*, an attorney representing the debtor "consents to direct communication with the consumer," 15 U.S.C. § 1692c(a); may generally not "communicate . . . with any person other than the consumer," § 1692c(b); requires the debt collector, upon notice, "to cease further communication with the consumer," § 1692c(c); and specifies that certain

employed the phrase "communication with" in other excise tax provisions that apply to one-way communications, such as those imposed upon the excess lobbying expenditures of public charities and private foundations. *See, e.g.*, 26 U.S.C. § 4911 (as to public charities, defining the expenditures potentially subject to this tax as including "any attempt to influence any legislation through communication with any member or employee of a legislative body); *id*. at § 4945(e) (applying same definition as to private foundations).[10] All these statutes illustrate well that Congress has traditionally used the phrase "communicate with" in accordance with its ordinary and popular meaning – one that does not require reciprocity in who can initiate a communication.

Nor, contrary to *USA Choice*, is a narrow interpretation of the word "with" dictated by the statute's structure. To be sure, it is a "fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Davis v. Michigan Dept. of Treasury*, 489 U.S. 803, 809 (1989).[11] As noted, the court in *USA Choice* emphasized that section 4252(b)(2) describes toll telephone service as involving communications "to or from" other persons, while the "local telephone service" definition found in section 4252(a)(1) refers to communication "with" other persons. According to the court, the former phraseology – "to or from" – captures "single-direction" communications, while the word "with" connotes reciprocity (presumably, the sort that must allow someone on either side of the line to initiate the call)." 73 Fed. Cl. at 792; *see also In re WorldCom, Inc.*, 2007 WL 1576149 at *7. But, this "structural" observation proves too much.

---

information must be provided in and after the "initial communication with a consumer in connection with the collection of any debt, § 1692g(a). The quoted references have been held to apply to written documents sent by the debt collector to the consumer. *See Swanson v. Southern Or. Credit Serv., Inc.*, 869 F.2d 1222, 1225 (9th Cir. 1988); *Ditty v. CheckRite, Ltd,* 973 F. Supp. 1320, 1329 (D.Utah 1997); *Bieber v. Associated Collection Services, Inc.*, 631 F. Supp. 1410, 1417 (D.Kan. 1986). A counterpart of the FDCPA, 26 U.S.C. § 6304, governs communications from tax collectors to taxpayers. It also uses the phrase "communicate with" even though it obviously encompasses only one-way communications originating from the tax collector.

[10] Other statutes using the phrase "communicate with" (or a slight variation thereof) have likewise been construed to apply to communications that could reasonably originate only from one of two parties in a relationship. *See, e.g.*, *Brown v. Glines*, 444 U.S. 348, 360-61 (1980) (interpreting 10 U.S.C. § 1034(a)(1), which prohibits restricting a member of the armed forces in "communicating with" a Member of Congress).

[11] A court must interpret the statute "as a symmetrical and coherent regulatory scheme," *Gustafson v. Alloyd Co.*, 513 U.S. 561, 569 (1995), and "fit, if possible, all parts into an harmonious whole," *FTC v. Mandel Bros.,* 359 U.S. 385, 389 (1959); *see also FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132-133 (2000) (parallel citations omitted).

For one thing, the distinction made by the court in *USA Choice* hinges upon a presumed precision in the use of the words in question that simply does not exist. One should be hesitant to conclude that Congress used the phrases in question with any more exactitude than their respective definitions would permit. *See* Felix Frankfurter, "Some Reflections on the Reading of Statutes," 47 Colum. L. Rev. 527, 528 (1947) ("If individual words are inexact symbols, with shifting variables, their configuration can hardly achieve invariant meaning or assured definiteness."). Any notion that Congress acted as its own lexicographer here, adopting some novel sort of "prepositional convention," is belied by the fact that other statutes use the phrase "with" and "to" interchangeably in the same section to refer to the same activity or transaction. An example may be found in 15 U.S.C. § 2055(c), which is entitled "Communications with manufacturers," but requires that the Consumer Product Safety Commission "communicate to" each manufacturer of a consumer product certain specified information.[12] Further indication that there is no structural distinction to be discovered here stems from the fact that, in 1965, when Congress employed the phrase "to or from" to define WATS service, that service was available only as an outbound service – the inward-dialing variety (now commonly called "800 numbers") was not introduced until 1967.[13] Accordingly, if one views the use of the word "to" in the WATS excise tax provision as a reference to outbound service, then one is left to conclude that

[12] The Internal Revenue Code is replete with examples of similar word pairings. For example, while section 162(e)(1)(D) of the Code prohibits a trade or business expense deduction for "any amount paid or incurred in connection with . . . any direct communication ***with*** a covered executive branch official in an attempt to influence the official actions or positions of such official," section 162(e)(2)(B)(i) provides an exception for ordinary and necessary business expenses incurred in "sending communications ***to*** the committees, or individual members, of" a local council or similar governing body. 26 U.S.C. §§ 162(e)(1)(D), 162(e)(2)(B)(i) (emphasis added). A similar pattern may be found in the excise tax imposed on the "excess lobbying expenditures" of public charities – section 4911(d)(1)(B) imposes the tax on expenditures related to "communication with" legislative bodies, while section 4911(d)(2)(C), excepts "communications to" certain governing bodies. See 26 U.s.C. §§ 4911(d)(1)(B), 4911(d)(2)(C). Indeed, 26 U.S.C. 4945(e)(2) contains, within a single paragraph, a similar rule and exception for lobbying expenditures by private foundations.

[13] According to a 1980 FCC tariff decision, outward WATS service was first made available by AT&T in 1961. *In the Matter of Am. Tel. and Tel. Co.*, 84 F.C.C.2d 158, 159 (1980). This decision goes on to explain that "[i]n 1967, AT&T introduced Inward WATS (now called '800 Service'), a service which had a rate structure similar to that of Outward WATS," adding that "[i]nstead of being able to originate interstate telephone calls, the Inward WATS customer could receive interstate telephone calls at a flat rate for the full time or measured time periods from callers located anywhere in the country or in a designated geographical area." *Id*. at 160. Indication that Congress, in 1965, was aware that the WATS long-distance service was outbound only may be found in the reports accompanying the 1965 Act. *See* H.R. Rep. No. 89-433, at 30; S. Rep. No. 89-324, at 35; *see also National R.R. Passenger Corp*. v. United States, 338 F.Supp.2d 22, 29 (D.D.C. 2004), *aff'd*, 431 F.3d 374 (D.C. Cir. 2005).

the word "from" in that same provision was, when enacted, meaningless – an unacceptable result.[14] This is, of course, yet another indication that Congress intended nothing by using different prepositions in the definitions it employed in the communications excise tax.

The court's suspicions in this regard are confirmed by the statute's legislative history. Beginning in 1917, Congress imposed excise taxes "upon each telegraph, telephone, or radio, dispatch, message, or conversation, which originates within the United States," with various rates and minimum charges.[15] These provisions remained largely the same until 1941, when Congress added a provision imposing "[a] tax equivalent to 6 per centum of the amount paid by subscribers for local telephone service." Revenue Act of 1941, § 548, 55 Stat. 687, 714; *see also* Excise Tax History, *supra*, at CRS-4. But, this statute did not define "local telephone service." In 1958, Congress reorganized what by then was referred to as the "communications services" excise tax, dividing the objects of the tax into six categories, two of which are relevant here: "general telephone service" and "toll telephone service." Excise Tax Technical Changes Act of 1958, Pub. L. No. 85-859, 72 Stat. 1275, 1289. The former was defined as –

> any telephone or radio telephone service furnished in connection with any fixed or mobile telephone or radio telephone station which may be connected (directly or indirectly) to an exchange operated by a person engaged in the business of furnishing communication service, if by means of such connection communication may be established with any other fixed or mobile telephone or radio telephone station.

*Id*. at §133(a) (codified at 26 U.S.C. § 4252(a)). As the quoted language reveals, this definition applied to any service through which a communication "may be established" regardless of who initiated the communication or which way it primarily flowed. Under the 1958 Act, "toll telephone service" was defined as "a telephone or radio telephone message or conversation for which (1) there is a toll charge, and (2) the charge is paid within the United States." *Id.* (codified at 26 U.S.C. § 4252(b)).

---

[14] Such a reading, of course, would be contrary to a well-known canon of construction, *to wit*, that "a legislature is presumed to have used no superfluous words." *Platt v. Union Pac. R.R. Co.*, 99 U.S. 48, 58 (1878); *see also Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 698 (1995) (noting a "reluctance to treat statutory terms as surplusage"); *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979); *Grapevine Imp., Ltd. v. United States*, 71 Fed.Cl. 324, 342 (2006).

[15] *See* National Industrial Recovery Act of 1933, Pub. L. No. § 212, 48 Stat. 195, 206; Revenue Act of 1932, Pub. L. No. 72-154, § 701(a), 47 Stat. 169, 270; Revenue Act of 1918, Pub. L. No. 65-254, § 500, 40 Stat. 1057, 1102; War Revenue Act of 1917, Pub. L. No. 65-50, § 500, 40 Stat. 300, 315; *see also Office Max*, 428 F.3d at 585 (describing portions of this history).

Illustrating the breadth of the concept of a "general telephone service," the Senate and House Reports accompanying the 1958 Act provided several examples of its coverage. S. Rep. No. 85-2090, at 47-48 (1958); H.R. Rep. No. 85-481, at 43-44 (1957). By way of explanation, the Senate Report states:

> The definition of "general telephone service" looks to the capabilities of the existing physical facilities of any telephone or radio telephone service. The amendment clearly includes as general telephone service that service which may be connected (directly or indirectly) to an exchange operated by a person engaged in the business of furnishing service as a communications common carrier. If the existing facilities may be so connected, it is immaterial that the practice of the subscriber is not to make such connections, or that the person engaged in the business of furnishing communication service denies permission to the subscriber to make such connections.

S. Rep. No. 85-2090, at 47; *see also* H.R. Rep. No. 85-481, at 43 (making this same statement with minor word changes).[16] Both reports further indicate –

> [i]f a common carrier has callboxes placed throughout an area to be used in the conduct of its business and the callboxes of the common carrier may be connected, directly or indirectly, with general telephone service, the common

---

[16] This passage reflects a modification to the definition of "general telephone service" made by the House Committee on Ways and Means. Section 133(a) of the original bill, H.R. 12298, which was introduced on July 18, 1956, would have limited "general telephone service" to situations in which a a telephone set "is" connected to a qualifying exchange. At the urging of the Ways and Means Committee, the word "is" was changed to "may" in the H.R. 7125, as introduced on May 2, 1957. Explaining this change, Congressman Jere Cooper, the chair of that committee, stated –

> One substantive change was made . . . in the definition of "general telephone service". In order for a fixed or mobile telephone or radio-telephone sending or receiving set to be taxed, as general telephone service, under the language previously adopted, such a set would have had to be connected (directly or indirectly) to an exchange, operated by a person engaged in the business of furnishing communication, in such a manner that communication could be established with any other set. Under the language change approved by the Committee, the earlier requirement that such a station had to be connected is modified so that only the physical possibility of making the connection will be required.

Statement of the Honorable Jere Cooper, Chairman of the Committee on Ways and Means (May 8, 1957); *see also* 102 Cong. Rec. 8205 (May 15, 1956) (comments of Cong. Cooper).

> carrier has general telephone service taxable as such on all service that may be so connected. . . . It is immaterial that the practice of the common carrier is not to make such connections with the general telephone service or that the person engaged in the business of furnishing communication service denies permission to make such connections. If the existing facilities may be connected directly or indirectly with general telephone service, such fact is sufficient tor result in the imposition of tax on such service.

S. Rep. No. 85-2090, at 48; H.R. Rep. No. 85-481, at 44.

And so things remained until the passage of the 1965 Act, which again reorganized the categories of communication services subject to the tax. That legislation was proposed by President Johnson in a May 17, 1965, message to Congress, which legislation included the same definitions of "local telephone service" and "toll telephone service" that use the differing prepositions at issue. *See* Committee on Ways and Means, U.S. House of Representatives, "Legislative History of H.R. 8371, 89th Congress, The Excise Tax Reduction Act of 1965," at 51 (1965) (hereinafter 1965 Act Legislative History); *see also Western Elec. Co.*, 564 F.2d at 59-60. A section-by-section analysis accompanying the bill indicated that the main change that was intended by the reorganization was "to reflect the exemption for private communication services." 1965 Act Legislative History at 104. This explanation indicated that, with two exceptions, the definition of "local telephone service" was designed generally to track the prior concept of "general telephone service." The first exception was the exclusion, from the definition of "local telephone service," of "private communication services" – a matter that the court will address shortly. *Id*. The second involved a modification to the definition of "toll telephone service" to include the WATS service that had originated in 1961. In this regard, the section-by-section analysis explained:

> Paragraph (2) of section 4252(b) of the code as amended by the bill includes WATS (wide area telephone service) in the definition of toll telephone service. WATS is a long-distance service, whereby, for a flat charge, the subscriber is entitled to make unlimited calls within a defined area (sometimes limited to a maximum number of hours). Under present law, WATS is classified as "general telephone service"; it would appear to be more properly classified as "toll telephone service."

*Id*. at 105. The definitions of "local telephone service" and "toll telephone service" that were proposed by President Johnson were included, in pertinent part, in the bill, as introduced in the House of Representatives, *see* H.R. 8371, at 25-26 (May 24, 1965), and were enacted into law. Both of the accompanying reports indicate that the definition of "local telephone service" corresponds to the prior definition of "general telephone service," with the exceptions previously noted. H.R. Rep. No. 89-433, at 30; S. Rep. No. 89-324, at 35.

C.

Several points flow from this legislative history. First, there is no indication whatsoever that Congress attached any – let alone talismanic – significance to its use of the preposition "with" in section 4252(a) and the prepositions "to and from" in section 4252(b). Rather, the 1965 legislative history reveals that these definitions came from the Executive Branch and were included in the bill that became the 1965 Act, with the primary purpose of excluding "private communication services" from the tax. *See Western Elec. Co.*, 564 F.2d at 57. In short, the legislative history suggests that neither the President nor the Congress intended anything by their selection of differing, yet common prepositions. Second, various examples given in the 1958 legislative history illustrate that Congress felt that communication services that were not reciprocal, in that communication could be initiated by only one of the two parties on the line, were, nonetheless, included within the 1958 Act's definition of a "general telephone service." Indeed, upon reflection, the callboxes cited in that legislative history resemble the PRI lines at issue – in both instances, an authorized party used a service designed to initiate contact with a particular entity. Moreover, at the time the 1965 Act was enacted, WATS lines worked much like callboxes – albeit in reverse, as the service subscriber had to initiate all the calls – which is significant, because the legislative history of the 1965 Act indicates, that, under the 1958 version of the statute, such lines were viewed as a "general telephone service." This last point leads to a final and critical observation: the legislative history of the 1965 Act suggests that, with the exceptions noted, the concept of "local telephone service" was viewed by Congress as being coterminous with the "general telephone service" concept employed in the 1958 Act. The latter term, recall, was defined as requiring only that a communication be "established," thereby certainly sweeping in services of the sort at issue here that were not reciprocal. As such, it is logical to conclude that because Congress, in 1958, believed that a service in which one party initiated a call involved a "general telephone service," it believed that the same sort of service was a "local telephone service" under the 1965 Act.

This legislative history provides further evidence that the definition given the word "with" in *USA Choice* is too rigid. Instead, this history buttresses the most natural reading of the statute – one that does not require reciprocity in terms of who may initiate a call.[17] It requires the

[17] Several revenue rulings support this conclusion. *See* Rev. Rul. 77-196, 1977-1 C.B. 343 ("In defining taxable local telephone service, section 4252(a)(1) makes no distinction between systems that provide access to a local telephone network only by receiving calls and systems that both receive and originate calls."); Rev. Rul., 75-102, 1975-1 C.B. 351 (time-of-day and weather-forecast services sold by telephone company to businesses that incorporate advertising into messages that are played when persons call a local telephone number are taxable as a "local telephone service" under section 4252(a)(1)). In *Spang Indus., Inc. v. United States*, 791 F.2d 906, 913 (Fed. Cir. 1986), the Federal Circuit stated that "a revenue ruling is entitled to some weight as reflecting the Commissioner's interpretation of the regulation, but does not have the same force as a regulation." *See Xerox Corp. v. United States*, 656 F.2d 659, 671 n. 20 (Ct. Cl. 1981) ("[w]hile these rulings are not binding on the Secretary of Treasury or the courts, they

court to recognize that "inward dialing" and "one-way communication" are not synonymous phrases; that, although the PRI lines in questions were configured for "inward dialing," once a call was initiated, two-way communication occurred over lines that supported telephonic quality communication – service that, by all appearances, met the "access" and "privilege" requirements of section 4252(a) of the Code. And, this legislative history makes clear that this court may not, as was done in *USA Choice*, avoid this conclusion simply because plaintiff decided to communicate with only those members of the local telephone system who paid for a password. *See Comdata Network, Inc.*, 21 Cl. Ct. at 130.[18] In short, the legislative history regrettably confirms that *USA Choice* was wrongly decided and should not be followed.

To be sure, the Supreme Court long ago stated: "In the interpretation of statutes levying taxes it is the established rule not to extend their provisions, by implication, beyond the clear import of the language used, or to enlarge their operation so as to embrace matters not specifically pointed out." *Gould v. Gould*, 245 U.S. 151, 153 (1917); *see also Union Pacific Corp v. United States*,. 5 F.3d 523, 525 (Fed. Cir. 1993); *Renick's Estate v. United States*, 687 F.2d 371, 376 (Ct. Cl. 1982). More recently, this rule was applied in construing the communications excise tax. *See American Online, Inc. v. United States*, 64 Fed. Cl. 571, 576 (2005). But, invocation of this canon should be a matter of last, not first, resort, saved for situations in which other more reliable aids to interpretation fail. In particular, this canon should be inoperative if the legislative intent and purpose are evident from the statutory language and its legislative history. *See White v. United States*, 305 U.S. 281, 292 (1938); *Renick's Estate*, 687 F.2d at 376. It is not for this court to inject doubt where none exists. As was stated by Justice Holmes in *Irwin v. Gavit*, 268 U.S. 161, 168 (1925), in commenting on *Gould*: "it is said that the tax laws should be construed favorably for the taxpayers. But that is not a reason for creating a

---

may be helpful in interpreting a statute"); *Vons Cos., Inc. v. United States*, 51 Fed. Cl. 1, 7-8 (2001). While this court, in *USA Choice*, 73 Fed. Cl. at 792, rejected several revenue rulings construing section 4252, it did so, in this court's view, based upon its unduly narrow interpretation of the statute.

[18] Moreover, contrary to the finding reached in *USA Choice*, 73 Fed. Cl. at 794, the fact that the communication service offered here did not involve voice communication is also quite irrelevant. Again, the statute talks only in terms of whether the service is of "telephonic quality" and does not require that the stations on either side of the line actually be telephones or that the communications be voice, rather than data. Indeed, any distinction between voice and data communications has long become outdated in the face of Voice over Internet Protocol (VoIP) technology, which allows the routing of real-time, two-way voice communications over the Internet or any other packetized communications network. *See Vonage Holdings Corp v. FCC*, 2007 WL 1574611 (D.C. Cir. Jun. 1, 2007) (upholding FCC ruling that VoIP carriers were providers of telecommunication services for purposes of 47 U.S.C. §254(d)).

doubt or for exaggerating one."[19] This canon, moreover, does not require the court to construe every statute establishing a tax in the taxpayer's favor – rather, by its terms, it only applies to ***extensions*** beyond the statutory language and there is no extension here, given the statutory language and its legislative history.[20]

D.

A final issue remains. As noted, Congress has carved from the definition of "local telephone service" an exception for so-called "private communication service." The latter phrase is defined by section 4252(d) of the Code as –

---

[19] *See also Burnet v. Guggenheim*, 288 U.S. 280, 286 (1933) (Cardozo, J.) ("[t]here are many facets to such a maxim. One must view them all, if one would apply it wisely. The construction that is liberal to one taxpayer may be illiberal to others. One must strike a balance of advantage."). Although not determinative here, it is worth noting that, over the years, the Supreme Court has severely limited the *Gould* canon, holding, for example, that: (i) the Code's definition of income should be "given a liberal construction ... in recognition of the intention of Congress to tax all gains except those specifically exempted," *Comm'r of Internal Revenue v. Glenshaw Glass Co*., 348 U.S. 426, 429-3430 (1955); (ii) deductions "depend[ ] upon legislative grace" and are allowed "only as there is clear provision therefor," *New Colonial Ice Co. v. Helvering*, 292 U.S. 435, 440 (1934); and (iii) "exemptions from taxation are to be construed narrowly," *Bingler v. Johnson*, 394 U.S. 741, 752 (1969), *see also Comm'r of Internal Revenue v. Jacobson*, 336 U.S. 28, 49 (1949).

[20] Plaintiff also fails to gain any ground by asserting that its PRI lines did not provide "local telephone service" because they connected its network in Doylestown with local exchanges outside of Doylestown. Under the statute, it is access to "a" local telephone system that constitutes local telephone service, provided that there is also the privilege to communicate with the individuals making up that local telephone system. Evidence that a service is a "local telephone service" even if it connects a telephone station located outside a local telephone system area with a central office in such system may be found in section 4252(d)(3) of the Code, which exempts from the tax on "local telephone service" the "channel mileage" that performs such a connection. As defendant points out, there obviously would be no need for such an exemption if such a service – commonly known as a "foreign exchange service" were not a "local telephone service" in the first place. Here, each of the PRI lines provided a direct connection between Comcation's network and "a" local telephone system. Indeed, in unrebutted testimony, defendant's expert, Dr. Hill explained that the PRI lines allowed a Comcation subscriber to make contact with the ISP without leaving the local exchange. Accordingly, Comcation's PRI services are not outside the definition of "local telephone service" because they involve stations that, but for the service, would be located in a different local telephone system. *See* Rev. Rul. 75-9, 1975-1 C.B. 348 (reaching similar conclusion in case involving a radio station that purchased service to allow callers from outside the local area to make local calls to the station).

> (1) the communication service furnished to a subscriber which entitles the subscriber –
>
> > (A) to exclusive or priority use of any communication channel or groups of channels, or
> >
> > (B) to the use of an intercommunication system for the subscriber's stations,
>
> regardless of whether such channel, groups of channels, or intercommunication system may be connected through switching with a service described in subsection (a), (b), or (c),
>
> (2) switching capacity, extension lines and stations, or other associated services which are provided in connection with, and are necessary or unique to the use of, channels or systems described in paragraph (1), and
>
> (3) the channel mileage which connects a telephone station located outside a local telephone system area with a central office in such local telephone system,
>
> except that such term does not include any communication service unless a separate charge is made for such service.

Plaintiff asserts that the PRI line services in question fall within this definition, again citing *USA Choice* as support for this claim But, the court unfortunately is again forced to disagree – both with plaintiff's claim and the *USA Choice* analysis upon which it is based.

As noted, the exemption for "private communication service" was added by the 1965 Act. The legislative history of this provision was discussed extensively by the Court of Claims in *Western Elec. Co.*, *supra*. As described there, prior to the passage of that act, a business that desired an intercom service could either purchase that service from a telephone company as part of a package that included local phone service (*e.g.*, a Centrex or Private Branch Exchange (PBX) system) or could purchase intercom equipment outright from a communications equipment manufacturer. *Western Elec. Co.*, 564 F.2d at 56. The purchaser of such equipment, however, "enjoyed a distinct and important advantage over the Centrex or PBX subscriber – his equipment was free of the Federal excise tax." *Id*. at 57. As explained in the House and Senate reports accompanying the passage of the 1965 Act:

> The telephone companies presently are losing intrapremise business (and interpremise business within local areas) to those providing telephone and microwave equipment which can be purchased and operated by the users themselves. Installation of equipment in this manner is accompanied by a reduction in the service from the local telephone company. Businesses installing

> their own internal communications systems in this manner avoid the tax on the telephone company's charge for both equipment and services. With the ever-increasing number of varied services which modern science makes it possible for telephone companies to provide, the tax on private communication systems represents a severe competitive handicap to the expanded use of these new and varied services.

H.R. Rep. No. 89-433, at 30-31; S. Rep. 89-324, at 36; *see also Western Elec. Co.*, 564 F.2d at 64-65. Accordingly, "[i]t was in order to correct the competitive imbalance existing between telephone company-furnished services and subscriber-owned equipment that Congress passed section 4252 of the Internal Revenue Code of 1954, as amended." *Id.* at 57; *see also Trans-Lux Corp.*, 696 F.2d at 967 ("Congress enacted the private communication services exemption in order to correct the competitive imbalance that had developed between telephone company-furnished services and subscriber-owned equipment.").

Regarding the types of services to which this exemption was intended to apply, the legislative history of the 1965 Act further provides:

> The definition of a private communication service refers to a communication service where a subscriber is entitled to the exclusive or priority use of a communication channel or groups of channels. This is sometimes referred to as a private line. The reference to an intercommunications system is intended to refer to a private exchange system for a single subscriber and thus to cover private PBX systems (whether or not they have in-dialing).

H.R. Rep. No. 89-433, at 31; S. Rep. No. 89-324, at 36; *see also* H.R. Rep. No. 89-433, at 31 ("For the reasons indicated above, your committee's bill provides an exemption from the tax on local telephone service for private communications service if a separate charge is made for this service. It is understood that private lines and PBX systems generally will immediately qualify for this exemption."). Other features of the legislative history are consonant with this view. Thus, for example, the afore-mentioned section-by-section analysis provided by the Executive Branch in transmitting the language that would become section 4252(d) plainly stated that a "private communication system" is "a communication system solely for the use of a single subscriber." *See* 1965 Act Legislative History, *supra*, at 105.

Thus, it appears that plaintiff's PRI lines fall outside this exemption. Certainly, those lines did not constitute an "intercommunication" system, at least consistent with the ordinary understanding of the quoted term, which, after all, is the long form of the more familiar term "intercom." *See* http://www.m-w.com/dictionary/intercom (as accessed on August 10, 2007) ("a two-way communication system with a microphone and loudspeaker at each station for localized use"); http://dictionary.reference.com/browse/intercom (explaining the etymology of the word "intercom") (as accessed on August 10, 2007). To qualify under this definition, a system must work within a single premise, that is, be intrapremise. *See Trans-Lux Corp*, 696 F.2d at 967

(exemption under section 4252(d) provides that "the charges for intrapremise telephone services and associated services [are] not subject to the excise tax even though the telephones also had access to a local exchange system"); *Fortis, Inc. v. United States*, 420 F.Supp.2d 166, 174-75 (S.D.N.Y. 2004), *aff'd*, 447 F.3d 190 (2d Cir. 2006). Such is not the case here. Nor did the PRI lines in question give plaintiff "exclusive or priority" use of a "communication channel or group of channels" within the meaning of the statute. This latter exemption is still designed for a single subscriber, albeit one that that has more than one premises and wishes to interconnect them using what the legislative history refers to as a "private line." *See* H.R. Rep. No. 89-433, at 31; S. Rep. No. 89-324, at 36.[21] But, the PRI lines here, with two exceptions,[22] did not connect one of plaintiff's sites to another, nor were those lines shared with a few other subscribers who wish to use them to interconnect their premises. Rather, those lines connected plaintiff with anyone within the a given local telephone system, including thousands of its own ISP customers. As such, it is not the case that the "subscriber" to the services in question – in this case, plaintiff – had the "exclusive or priority use" of communication channels as against any of the individuals who dialed the various local access numbers.[23]

In short, on the facts of this case, the court finds that plaintiff's PRI lines are neither like the intercom services nor the private lines that Congress intended to exempt in passing section 4252(d). Rather, its lines were accessible to its ISP customers who were not the "subscriber[s]"

---

[21] Consistent with this view, one of the tariffs in question, that of Bell Atlantic, defines a "private line" as "a channel for communication, between telephone instruments or apparatus, which is not normally connected for either exchange or toll service or for program transmission." *See also* Harry Newton, Newton's Telecom Dictionary 549 (17th ed. 2001) (a "private line" is "[a] direct circuit or channel specifically dedicated to the use of an end user organization for the purpose of directly connecting two or more sites in a multisite enterprise . . . .").

[22] Defendant conceded in its post-trial brief that two of these lines did not provide local telephone service and that it would issue a refund to plaintiff's for these accounts in the amount of $176.26. One of these lines connected Comcation's network to the Internet backbone and another connected Comcation's data center to Mr. Smith's home.

[23] Again, several revenue ruling support this conclusion. In Rev. Rul. 79-405, 1979-2 C.B. 383, the IRS provided an example of the sort of private lines that are covered by section 4252(d)(1)(A), describing therein a "'private line, point-to-point service . . . designed to provide a customer that has business locations in each of two cities . . . . with an exclusive, private communications channel between those two locations." *See also* Rev. Rul. 73-171, 1973-1 C.B. 445 ("when [automatic call distributing equipment] is provided for use only in connection with a local telephone service, it cannot be said it is a service provided in connection with an exclusive, or priority use communication channel, or with a subscriber's private communication system").

to the phone service in question.[24] Cognizant that "exemptions from taxation are to be construed narrowly," *Bingler*, 394 U.S. at 752, the court thus finds that the PRI lines in question did not constitute a "private communication service" so as to be exempt from the definition of a "local telephone service."[25]

## III. CONCLUSION

Undoubtedly, there are times that Congress, in exercising its taxing powers, fails to keep pace with technological evolution. Indeed, that failure might be purposeful. In such circumstances, a court should be loathe to take an analytical path that would stretch statutory language to cover situations that do not fall within its meaning, as enacted. Yet, the reverse is also true – a court should not give a statute, as written, less than its full compass simply because the technology involved could not have been specifically contemplated by the Congress in passing the law. And so, while it is tempting to give credence to the fact that Congress could not have had ISPs in mind, when, in 1965, it passed the current version of the communications

---

[24] In concluding otherwise, the *USA Choice* court again improperly focused on taxpayer-imposed limitations in concluding that the service there was a "private communication service." In this regard, the court rejected defendant's argument that the use was not private because it included the ISP's customers, stating: "This ignores that the use by USA Choice's customers of the channels at issue is by dint of their relationship with USA Choice," adding "[a] dial-up customer pays money to USA Choice, and USA Choice adds to its database the dial-up customer's username and password, allowing the customer to establish and maintain an internet connection." 73 Fed. Cl. at 801. As discussed in greater detail above, this analysis places undue emphasis on the particular way that the ISP there used the lines in question, rather than on the access and privilege that the ISP obtained by virtue of its various contracts.

[25] It should be noted that even if the PRI line services at issue otherwise qualified as a "private communication service," it is clear that some of these services (*e.g.*, those provided by Bell Atlantic) did not meet the portion of the exemption provision that required plaintiff to demonstrate that it paid a "separate charge" for the services. *See Western Elec.*, 564 F.2d at 58; *see also USA Choice*, 73 Fed. Cl. at 801 (disqualifying certain of the services at issue there on this basis). Part of the ambiguity in the record in this regard is caused by plaintiff's failure to raise any issues regarding the application of the "private communication service" exemption in its pretrial brief. While plaintiff's post-trial brief does make arguments regarding section 4252(d), plaintiff waited until its post-trial reply brief to raise cohesively an argument that its counsel invoked at closing argument – that the services in question were "private communication services" under section 4252(d)(3) of the Code as channel mileage charges. Since this argument clearly would have benefited from factual development and was not raised until after proof was closed, the court deems it waived. See *Principal Life Ins. Co. v. United States*, 70 Fed. Cl. 144, 157 (2006); *see also Price v. Inland Oil Co.*, 646 F.2d 90, 95-96 (3d Cir. 1981); *Rodrigues v. Ripley Indus.*, 507 F.2d 782, 786-87 (1st Cir. 1974).

excise tax, the question remains: is the service at issue that which Congress in the statutory language actually taxed?

In the court's view, it is. Based upon the foregoing, and finding plaintiff's remaining arguments unavailing,[26] the court concludes that the PRI lines in question, indeed, constitute a taxable "local telephone service" within the meaning of sections 4251 and 4252 of the Code. As such, those lines are subject to the communications excise tax imposed by section 4251 of the Code. Accordingly, no refund is warranted and the Clerk instead is ordered to dismiss plaintiff's complaint.

**IT IS SO ORDERED**.

s/ Francis M. Allegra
Francis M. Allegra
Judge

[26] For example, plaintiff claims that Congress evidenced its intent to exempt ISPs from taxation in the Internet Tax Freedom Act, Pub. L. No. 105-277, §§ 1100 to 1104, 112 Stat. 2681-719 (1998), but that statute only applies to taxes imposed by States and their political subdivisions.